**People of the State of Illinois, Defendant in Error, v. Bobbie Haygood, Plaintiff in Error.**

**Gen. No. 49,790.**

First District, Third Division.

June 3, 1965.

Heinze & Askew, of Chicago, for plaintiff in error.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Kenneth L. Gillis, Assistant State's Attorneys, of counsel), for defendant in error.

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

Bobbie Haygood and Donald Paulson were indicted for the murder of Lee James. The indictment charged that the defendants struck James about his head and body with baseball bats and that this beating caused his death. They were tried by a jury, found guilty and their punishment was fixed at 40 years in the

penitentiary. Judgments were entered upon the verdicts.

This appeal is by Bobbie Haygood only. To reverse his conviction he asserts as errors (1) that he was not proven guilty beyond a reasonable doubt; (2) that he was unduly restricted in the cross-examination of a witness for the State and (3) that an instruction given at the request of the State was improper.

The events in this case took place in two locations and revolved around two groups of three men. One of the locations was the New Southern Inn, a tavern in the 3200 block on North Clark Street, Chicago; the other was My Cafe, a restaurant diagonally across the street from the tavern. There was a business connection between the tavern and the restaurant. Two of the men in the first group of three were associated with the tavern: Johnny Glisson was its manager and Donald Paulson was its bartender. Sometimes Paulson would be assigned the job of checking the identification of customers and for this purpose would be stationed at the front door. The association with the tavern of the third man of the group, the defendant Bobbie Haygood, was in dispute. He was described as the tavern's bouncer and part-time bartender, but he himself testified that he was not an employee of either the tavern or Glisson. The second group of three men were friends and occasional customers of the tavern: Robert Raby, Walter Johnston and the deceased, Lee James.

About 2:30 a. m. on the morning of July 9, 1960, Raby and Johnston were in the tavern when an argument took place between some customers, one of whom was a friend of Johnston. As an outgrowth of this argument another one ensued between Glisson, the manager, and Johnston. Paulson was nearby at the time and Haygood was said to have been within hearing distance. Glisson accused Johnston of starting the

72

trouble and said he was going to have him arrested. Policemen came and the argument continued outside the tavern. Glisson said that Johnston was a troublemaker and had assaulted him; he wanted the police to arrest him. He told Johnston he would get the "hillbillies" after him. Johnston replied that he would knock Glisson's teeth down his throat. No arrests were made. Glisson went back in the tavern and Johnston and Raby departed.

After visiting another tavern nearby, Johnston and Raby decided to go to the My Cafe. On their way to the restaurant, around 4:00 a. m., they saw Glisson and Haygood standing in front of the Southern Inn. Johnston yelled across the street: "Hey, Johnny Glisson, I think I know where you live." Glisson did not reply. As they approached the restaurant Johnston and Raby met Lee James, a CTA bus driver, who was getting out of his parked car. The three entered the restaurant together and sat at one of the tables.

The restaurant was small and crowded. The Southern Inn closed at 4:00 a. m. and in the crowd were some of the people who had been at the tavern. The tables were filled, all the seats at the counter were occupied but only one waitress was on the job. After waiting for service for several minutes, Raby went to the counter, got the waitress' attention and ordered three cups of coffee. He leaned over to talk to a girl who was seated at the counter and as he did so he was hit on the side of his head. He turned and saw that his assailant was Paulson and that Paulson was striking him with a baseball bat. He slumped to the floor and lost consciousness. He regained consciousness a few times and once when he came to he saw Haygood with a baseball bat in his hands.

Paulson had been observed entering the restaurant, going immediately back of the counter and whispering to another Glisson employee who was seated at

the counter. One customer who was at the counter saw Paulson reach behind the counter while Raby was standing there. She saw him pick up a bat and swing it at Raby three or four times like he was hitting a baseball. She heard him call Raby a "son of a bitch" and heard him exclaim: "This will teach you to cause trouble." Another witness also saw Paulson reach behind the counter. This witness said that he came up with two bats, one of which he gave to Haygood who had just entered the restaurant.

Johnston heard Raby scream and rushed to help him. As he did so he was struck from the rear, he did not know by whom; but as he fell to the floor he saw Haygood behind him swinging a bat. Lee James also came to Raby's assistance. Haygood hit him with the bat on his head, the base of his skull and on his shoulder blades. Johnston and James were also beaten by Paulson. Johnston was beaten again as he struggled out of the front door. James, covered with blood, was hit again by Haygood as someone helped him out of the door, where he fell onto the hood of a car. Raby was dragged out by Haygood and thrown into the street. Raby, Johnston and James were hospitalized. James died 16 days later.

After the first blows were struck a general melee broke out. Men fought and women screamed; customers scrambled to escape; cups and saucers were hurled through the air; tables and chairs were overturned and dishes and glasses crashed to the floor. An employee of the restaurant, its dishwasher and porter, struck James in the forehead with a sugar bowl and Haygood was hit in the head by one.

The waitress who was on duty that night and who was the manager of the restaurant, testified for the defense. She described the scene in detail but said that no bats were used and that she did not remember Haygood being present. The dishwasher testified that

74

he did not see Haygood. A customer testified for the defense that the fight was a "big free-for-all," that no weapons were used and that she did not see Haygood in the restaurant. Paulson testified in his own behalf and said that a general fight suddenly broke out, that he was hit and that he defended himself with his fists. He said that he did not see Haygood in the restaurant. Haygood, however, admitted that he was there. But he denied having or using a bat. He denied striking James; he denied participating in the fight, and he denied dragging Raby to the street. He testified that he was in the restaurant only for three minutes. He further denied hearing the argument at the tavern and standing in front of it with Glisson.

▮ In support of his contention that he was not proven guilty beyond a reasonable doubt, the defendant asserts that the State's witnesses are unworthy of belief because of their contradictory statements. There are some minor testimonial discrepancies but these concern such things as whether Raby and Johnston met James outside or inside the restaurant, the number of people present, the time when Paulson came in, whether tables were overturned, whether cups and sugar bowls were flying through the air, whether the porter saw a plunger in Paulson's hand instead of a bat and whether he found a plunger and a broken broomstick on the floor when he swept the place. With the confusion prevailing in the restaurant, it would be surprising if the witnesses did agree as to everything that happened. The varying details of the witnesses' testimony are readily understandable in view of the nature of the fracas, their different viewpoints and the layout of the restaurant. However, they do agree as to who started the fight, the slugging and Haygood's participation in it. Six witnesses testified that Haygood was present, four of them saw him with a bat in his hands, three of them saw him use his bat, two of them

75

saw him beat James with it and two of them saw him pull Raby from the restaurant and toss him in the street. The conflicting testimony on unimportant matters is insignificant in comparison with the consistent testimony on material factors. The evidence established Haygood's guilt beyond all reasonable doubt.

The defendant claims that he was unduly restricted in the cross-examination of an eyewitness for the State. A wide latitude is normally allowed in the cross-examination of a witness and the record in this case shows that such an examination was permitted of this witness on all relevant matters. The questions to which objections were sustained sought to raise unfavorable implications from the witness' being in the restaurant at 4:00 in the morning and from a date she had to meet a male friend at that hour. The trial judge properly excluded these irrelevant questions. They were not asked for the purpose of impeachment or to discredit her account of what happened and they had nothing to do with her capacity as an eyewitness to the crime. Rather, the purpose of the questions seemed to be to humiliate and degrade the witness. Cross-examinations of this kind have been disapproved in both criminal and civil cases. People v. Brown, 254 Ill 260, 98 NE 535; Schoolfield v. Witkowski, 54 Ill App2d 111, 203 NE2d 460.

The final contention is that an improper instruction was given the jury at the request of the State. The instruction was as follows:

"The Court instructs the jury that if the jury believe from the evidence, beyond all reasonable doubt, that a crime was committed, and if you also believe, beyond all reasonable doubt, that the defendant, Bobbie Haygood, immediately after the commission of the crime with which he stands charged, fled and remained away until taken into

custody, such flight is a proper circumstance to be considered in determining the guilt or innocence of the defendant, Bobbie Haygood."

Haygood was arrested in a tavern on the West side of Chicago four and a half weeks after the occurrence in the restaurant. The arresting officer testified that he went to the tavern after receiving information from a telephone call; when he approached the man who fitted Haygood's description and asked for his name he was given a name different than Haygood. The State argues that the instruction was proper because of this testimony. At the conference on instructions the trial judge stated that he overruled the defendant's objections to the instruction because Haygood fled from the restaurant and remained away until he was taken into custody and because when arrested he gave a name other than Haygood. There was testimony that Haygood left the restaurant but there was none that he left in haste, that he went into hiding or that the police were searching for him and that he could not be found in his usual haunts or place of abode.

A similar instruction was before the court in People v. Herbert, 361 Ill 64, 196 NE 821. In the Herbert case the defendant was convicted of murder and sentenced to life in the penitentiary. He was convicted despite a strong alibi on the testimony of one witness whose identification of the defendant prior to the trial, from pictures and when he was brought into her presence, was such as to create doubts of her accuracy. The court stated that the only evidence of flight was the testimony of a police officer that he was looking for the defendant. The officer did not explain what steps he took in looking for the defendant, what inquiries he made or where and of whom he made them. The court observed: "There was no evidence that the

defendant attempted to keep out of sight of police officers, that he was disguised or that he assumed a name different from his own." The court said that "flight" in legal parlance meant: "not merely a leaving, but a leaving or concealment under a consciousness of guilt and for the purpose of evading arrest." The court concluded that the evidence in the record did not justify the instruction and that giving it was reversible error.

The present case differs from the Herbert case because of the overwhelming evidence of Haygood's guilt and because of the fictitious name given by him when arrested. In his testimony Haygood neither denied nor explained his use of the false name. The assumption of a fictitious name would be an indication of flight because it discloses the intention to conceal one's identity and to evade arrest. The instruction in the present case, however, does not mention this indication of flight as a circumstance to be considered in determining the defendant's guilt or innocence; it speaks instead of the defendant's fleeing immediately after the commission of the crime and remaining away until taken into custody—indicia of flight not supported by evidence. Giving an instruction on flight in these terms was not justified by the evidence and was error but was not reversible error because there was concealment of identity and because of the clear evidence of Haygood's guilt.

The purpose of review in a criminal case is not to determine whether the record is perfect, but to determine whether the defendant has had a fair trial under the law and whether his conviction is based upon evidence establishing his guilt beyond all reasonable doubt. People v. Davis, 10 Ill2d 430, 140 NE2d 675. It has been frequently held that even though error may have been committed in giving or refusing

instructions, it will not always justify reversal when the evidence of the defendant's guilt is so clear and convincing that the jury could not reasonably have found him not guilty. People v. Ward, 32 Ill2d 253, 204 NE2d 741.

The judgment of the Criminal Court will be affirmed.

Affirmed.

SULLIVAN and SCHWARTZ, JJ., concur.