THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* FRANCISCO GAMBOA, Defendant-Appellant.

(No. 58973;

First District (3rd Division)—June 19, 1975.

Paul Bradley and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Scott W. Peterson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

On a Saturday night in December, 1970, the defendant, Francisco Gamboa, killed two men and shot two others in a Chicago tavern. He was indicted for the crimes and a jury found him guilty of three of them: the murder of Frederico Medina Reyes and the attempt murder and aggravated battery of Medina's brother, Gilberto Reyes. Gamboa was sentenced to 28 to 75 years in the penitentiary for the murder and 5 to 10 years for the aggravated battery. No sentence was imposed for the attempted murder.

■■ Nine issues and many sub-issues are raised on appeal. One is whether the defendant was proved guilty beyond a reasonable doubt; another questions the closing argument of the prosecutor; five allege miscellaneous trial errors and two concern the length of the sentences. Of the latter, the one pertaining to the excessive penalty for aggravated battery can be disposed of readily. Aggravated battery is a Class 3 felony and the minimum sentence for a felony of this class cannot be greater than one-third of the maximum sentence. (Ill. Rev. Stat. 1973, ch. 38, pars. 12—4(d), 1005—8—1(c)(4).) In no event, therefore, can the defendant's sentence for this offense be more than 3⅓ years.

The tavern was located on the west side of Racine Avenue. It was a long and rather narrow place, east to west in length and north to south in width. The bar was on the north side, to the right of the Racine Avenue entrance. West of the bar were tables and a booth. Back of the booth was a ladies' washroom and back of that, at the extreme northwest corner of the tavern, was a men's washroom. Immediately in front of the entrance and extending along the south wall almost to the west end of the tavern were additional booths and tables.

Almost one-half of the area at the extreme west end was taken up by the washrooms. On the night of the shooting a small space to the south and east of these rooms was set aside for dancing. A pool table which normally occupied this space was moved into a corner formed by the west wall of the building and the south wall of the men's room. In front of the table were chairs for a four-piece orchestra. Into the area between the washrooms and the pool table, and the patron tables at the south wall, were crowded four musicians, their instruments and the dancers. It was in this vicinity that the shooting took place.

A large number of witnesses testified at the trial, many with the aid of an interpreter. Although their testimony varied in minor respects and was not always clear, the following is a fair distillation of the 4,231 page record: The tavern was operated by Miguel Aguilar who kept a .38-caliber chromium-plated revolver behind the bar in a drawer next to the cash register. There were about 50 people present shortly after mid-

night when the first shot was fired. Gamboa and a friend, Raphael Olaguez, were sitting in the last booth on the north wall, just east of the washrooms. Gamboa was armed with a fully-loaded and cocked .45-caliber automatic pistol. Medina and Gilberto Reyes knew Gamboa and Olaguez and talked with them that night. After leaving the men's washroom, Medina stopped at Gamboa's booth and spoke with him before rejoining his brother Gilberto at the bar. Later they left the bar, walked to the rear and requested Marcario Cantu, the orchestra leader, to play a number they wanted. Gamboa then stepped from his booth and asked Cantu to play one for him. The Reyes brothers did not return to the bar and Gamboa did not return to his booth. He sat down on the pool table, put his feet on Cantu's amplifier and offered to buy the musicians a drink. While the two songs were being played, Gilberto and Olaguez had a conversation. It apparently was not friendly for Olaguez took off his jacket, put it on a table and they walked toward the front door.

They had not gone far when a shot was fired. Medina fell to the floor, face up with his arms outstretched. Cantu turned in the direction of the shot and saw Gamboa standing in the entrance of the men's room. His arm was elevated and a gun was in his hand. Miguel Aguilar, who had been behind the bar, raced through the crowd; as he reached the washrooms Gamboa shot him two times. He fell face down on top of Medina. Customers rushed out the front door. A waitress called the police and someone called Miguel's brothers, Rudy and Joe Aguilar, who were conducting a dance in a union hall across the street. Gamboa stepped out of the washroom and asked Olaguez, who had come back, "Where is the other one?" He apparently was referring to Gilberto who was hurrying to his fallen brother. When Gamboa saw Gilberto he raised his gun and shot him in the chest. Gilberto managed to grab Gamboa and struggled with him. As Gilberto fell to his knees Gamboa exclaimed, "Let me finish you, mother fucker" and shot him a second time. Gilberto slumped to the floor. A patron, Maria Santana, threw herself on top of him. Although Cantu had warned his fellow musicians to take cover, he did not do so himself and he was wounded by a bullet from Gamboa's gun.

Gamboa's automatic jammed and he dropped it just before a bartender forced him to the floor. Rudy and Joe Aguilar came into the tavern. Rudy screamed when he saw his dead brother and asked the bartender holding Gamboa who did it. Gamboa spoke up and said he did not know, but Rudy was told and he kicked Gamboa and pistol whipped him with a revolver he brought from the dance hall.

Policemen poured into the tavern. They found Cantu sitting on a bar stool bleeding from his chest, Gilberto between two tables bleeding

from his chest and stomach, and Gamboa on the floor bleeding from his forehead. The body of Miguel Aguilar was lying face down on top of the face-up body of Frederico Medina Reyes. As Aguilar's body was moved, a .38-caliber chrome-colored revolver slid to the floor. The wounded were taken to hospitals and the dead were taken to hospitals and then to the morgue. Medina's death was caused by a bullet which went through his face into his brain. Aguilar was also shot in the face. His death was caused by two bullet wounds in his brain.

The police officers found that the .45 automatic was cocked and an expended shell was jammed in the slide. One live bullet was in the magazine clip of the automatic and one was recovered from Gamboa's pocket. Four spent .45 automatic shells were found on the floor of the men's washroom and another on the floor near the ladies' washroom. Two .45 bullets were recovered from the south wall opposite the men's room; one was found in Cantu's accordian case, and one near the ladies' washroom. The .38 chrome revolver contained five live bullets and one expended shell. A bullet, apparently fired from this revolver, was imbedded in the north wall of the men's room. In most of his testimony, which was given through an interpreter, Gamboa referred to Medina Reyes, Gilberto Reyes and Miguel Aguilar as "this guy" or "that guy" or "the man," but from the testimony of other witnesses it is reasonably clear whom he meant. He admitted the shooting, but explained it as either unintentional or justified in self-defense. He said he and his close friend Raphael Olaguez went to the tavern and sat in the northwest booth with Mrs. Santana. Gilberto Reyes called out to Olaguez and they spoke together. A few minutes later he noticed Gilberto and Medina standing in front of the musicians and he suggested to Olaguez that if he felt uncomfortable they could move closer to the musicians. They left the booth and sat on the pool table. Medina, Gilberto and Miguel Aguilar came up to them. Gilberto grabbed the lapels of Olaguez' jacket; Olaguez said forget it and Gilberto invited him into the washroom. When Gamboa told them there was no reason to argue, Medina told him not to butt in. Gamboa stood up, his jacket, which he had over his arm, was taken by Medina; Gamboa snatched it back and retreated to the washroom. Gilberto made a derogatory remark to Olaguez; Olaguez removed his jacket and he and Gilberto walked away. Gamboa tried to leave the washroom, but Medina told him not to, took a step forward, pulled out a small pistol and pointed it at Gamboa who then took out his own gun, released the safety and fired. Medina's head jerked back and he fell down. Gamboa said he did not mean to shoot or kill Medina. He was still standing near the doorway of the men's room when Aguilar ran up and hit him and then brought his fist up to hit him again. In doing so,

Aguilar struck Gamboa's gun hand and two shots were discharged from his automatic. Aguilar fell on top of Medina. Gamboa said that Aguilar frightened him; he thought the "man might cut me or shoot me." Gilberto than appeared with a .38 chrome revolver in his hand and pointed it at him. He, in turn, pointed his automatic at Gilberto, ran out of the wash-room, grabbed Gilberto's hand and bent it back toward his chest; the revolver went off and Gilberto was shot by his own gun. Gilberto pulled on Gamboa's arm as he fell causing Gamboa's automatic to discharge. Gilberto continued to hang on to him so Gamboa hit him on the head with his gun. He testified that he lost consciousness when Rudy Aguilar hit him over the head several times with a pistol and the next thing he remembered was being on a cart in a hospital.

Gamboa's testimony that he was unconscious was disputed by the police officers. They said he walked unaided from the tavern to a police vehicle and talked to them in the vehicle and at the hospital. One of the officers who spoke to him at the hospital testified that Gamboa said that he and his friend Raphael, whose last name he did not know, were in the tavern. Gamboa went to the washroom and was struck on the head as he entered. He turned and took a gun away from a man behind him and shot two or three people with it. As he walked toward the front of the tavern he was struck again on the back of the head. The police came and saved him. His testimony about losing consciousness was also con-tradicted by the doctor who attended him at the hospital. The doctor stated that although Gamboa was in pain, he was alert, oriented as to time and space and his recent memory was intact.

Gamboa's testimony about the events in the tavern not only conflicted with the statement he made at the hospital and with the testimony of the other eyewitnesses, it also conflicted with the physical facts. Gamboa placed guns in the hands of both Medina and Gilberto Reyes: an auto-matic pistol in Medina's hand and a chrome pistol in Gilberto's. No automatic, other than Gamboa's own, was recovered. A .38 chrome re-volver was recovered, but this was found not where Gilberto fell and not in his possession, but under the body of Miguel Aguilar, the tavern owner to whom it belonged. Medina fell on his back with arms out-stretched and palms turned up; no gun was in his hands and none dropped to the floor when he fell. Maria Santana, who had been sitting with Gamboa, said Medina had no gun. Marcario Cantu, the leader of the orchestra, saw the entire affray; he said Medina had none. No wit-ness, other than Gamboa himself, testified that either of the Reyes brothers was armed. The .38 revolver had been fired and the discharged bullet lodged in the wall of the men's washroom, 4 feet from the floor. No one saw Aguilar with his gun, but he owned it and kept it behind

his bar and it fell to the floor when his body was moved. It is a reasonable inference that he had the gun when he ran up to Gamboa after Medina had been shot, and that he fired at Gamboa who was still standing in the doorway of the washroom. This appears to have been the conclusion of the jury which absolved Gamboa of the Aguilar homicide.

■■ Evaluating the credibility of witnesses, weighing their testimony and determining where the truth lies is the function of the jury. The testimony of eyewitnesses seldom agrees in every detail and testimonial discrepancies in lengthy trial are not uncommon. They would not be unexpected where sudden and rapid gunfire occurs in a crowded tavern. Conflicting evidence of itself does not establish reasonable doubt, and only when the evidence is so unsatisfactory that it raises such a doubt will the verdict of a jury, approved by the presiding judge, be disturbed. (*People v. Disharoon* (1972), 5 Ill.App.3d 42, 282 N.E.2d 506.) Gamboa, however, goes further than citing discrepancies—he asserts that the testimony of Cantu was fabricated and because of its falsity it should be rejected by this court and his own version of the shooting accepted. The burden of proving this type of allegation is on the defendant; merely pointing to contradictory testimony does not warrant a conclusion that the disputed testimony was perjured. (*People v. Harris* (1973), 55 Ill.2d 15, 302 N.E.2d 1; *People v. Nuccio* (1973), 54 Ill.2d 39, 294 N.E.2d 276.) In essence, Gamboa's argument in support of his accusation is that Cantu's testimony is false because it conflicts with his own. This conflict, and the minor discrepancies in the testimony of other witnesses, totally fails to substantiate the assertion of perjury.

■■ The evidence established that the defendant was guilty of murder, not manslaughter. The shooting of Medina was deliberate, and the direct and natural result of the defendant's voluntary act was the destruction of another's life. (*People v. Brooks* (1964), 52 Ill.App.2d 473, 202 N.E.2d 265.) A finding of voluntary manslaughter would be warranted only if the evidence established that the defendant was seriously provoked or believed, albeit unreasonably, that he shot in self-defense. (Ill. Rev. Stat. 1971, ch. 38, par. 9—2(b).) The record does not support an inference that a purpose of self-defense, reasonable or unreasonable, prompted the shooting of Medina Reyes. While Gamboa implied that such was his reason, he never testified that he feared for his life or thought he was in danger. He said that Aguilar, whom he shot two times, frightened him and he thought Aguilar might shoot him, but he made no such references to Medina who, according to the testimony of all disinterested witnesses, was unarmed. Nor was there evidence of a sudden and intense passion resulting from serious provocation. (Ill. Rev. Stat. 1971, ch. 38, par. 9—2(a).) Assuming that the unarmed Medina did attempt

to restrain Gamboa from leaving the washroom, that act could not by any standard of objectivity arouse an irresistible passion to kill.

■■ The shooting of Gilberto was also intentional. After killing Medina and Aguilar, Gamboa asked his friend Olaguez where "the other one" was. As soon as he saw Gilberto he shot him. As Gilberto wrestled with him he shouted, "Let me finish you * * *" and shot him again. Gamboa's guilt of both the murder and the aggravated battery was proven beyond all reasonable doubt.

We have studied every trial error alleged by the defendant. Several are insignificant, so we will limit our discussion to those we consider more meritorious.

Olaguez, whose quarrel with Gilberto Reyes precipitated the shooting, did not testify at the trial. The prosecutor commented upon this in his closing argument and implied that the defendant's failure to call Olaguez as a witness indicated that he would not corroborate the defendant's testimony. An affidavit filed by Gamboa's attorney in support of the latter's motion for a new trial charged that Olaguez was in the custody of the State's attorney at the time the argument was made; that he had been brought from California and kept in or near the Criminal Court building during the last few days of the trial and had not been permitted to telephone the defense counsel. The post-trial motion asked the court to conduct a hearing as to this allegation. None was held and the defendant contends that the prosecutor's argument was unfair and the refusal to hold a hearing denied him the opportunity of proving that it was unfair.

Preliminarily, it must be emphasized that neither the post-trial motion nor counsel's supporting affidavit alleged that, if alerted to the presence of Olaguez in Chicago, Gamboa might have called him as a witness. Nor was it averred that the testimony of Olaguez in a new trial would probably alter the outcome. The possible existence of new evidence was not suggested by the motion and the only purported harm was that attributed to the comment of the State's attorney. We therefore have not considered the defendant's appellate arguments from *Brady v. Maryland* (1963), 373 U.S. 83, and Supreme Court Rule 415 (Ill. Rev. Stat. 1971, ch. 110A, par. 415), since those authorities pertain to the improper suppression of requested information and the obligations of parties regarding newly discovered information.

■■ If Olaguez was under the State's control, or available to testify as the State's or the court's witness, criticizing the defendant for not calling him would be manifestly unfair. And whether he was held by the State or not, under the circumstances of this case, the prosecutor's comment was unjustified. The record shows that Olaguez was a witness before

the grand jury and that Gamboa's indictment was based on his testimony. Among the things he told the grand jury were that he saw no gun in the tavern other than the one Gamboa had and that Gamboa was not injured until after the shooting had taken place. Under these circumstances it is understandable why Gamboa would not want to put him on the stand. Although he had been Gamboa's friend for 18 years, he had testified for the State and he could be regarded as more the State's witness than the defendant's. It is improper for a prosecutor to comment on a defendant's failure to call a witness where the comment suggests that the witness would have testified unfavorably to the defendant and the witness is as accessible to the State as he would be to the defendant. *People v. Munday* (1917), 280 Ill. 32, 117 N.E. 286.

Although the prosecutor's remark was error, the refusal to conduct a hearing on the accuracy of the charge in the defense attorney's affidavit was not. Alleged errors which appear solely from an affidavit accompanying a motion for a new trial need not be considered. (City of *Chicago v. Quane* (1968), 98 Ill.App.2d 100, 240 N.E.2d 150.) The affidavit was based on hearsay—information the attorney said he received from Olaguez. Hearsay is not a sufficient basis for a new trial motion. (*Smith v. Illinois Valley Ice Cream Co.* (1959), 20 Ill.App.2d 312, 156 N.E.2d 361; *Wilke v. United States* (9th Cir. 1970), 422 F.2d 1298.) The trial court did not err in denying the defendant's motion for an evidentiary hearing.

■■ In his argument the prosecutor also drew the jury's attention to the opening statement of Gamboa's counsel which did not outline what the defense intended to prove. The prosecutor stated that this was done:

> "* * * so he could figure out which little chink in your [our] case he could work his way through * * * looking for a corridor of deceit to wiggle through so he can wiggle out of this courtroom and down those stairs. That's why he wouldn't tell you out front what his defense was because he didn't know what it was and he wasn't going to find out until our case was over with and that's why you never heard about it."

This was an improper argument. Not as grievous an error, perhaps, as it would have been had the defense waived its opening statement, but error nonetheless. It exceeded the boundary of fair comment and implied that the defendant's counsel had resorted to trickery to free his client.

■■ Medina Reyes' stepdaughter, Teresa Sanchez, was employed in the State's attorney's office. She was on the State's list of witnesses and was permitted to remain in the courtroom during the hearings on pre-trial motions upon the State's representation that she would be used only as a life-and-death witness. Upon the same representation the prosecutor requested the court to bar the defendant from questioning her about her

being employed as his personal secretary. The court granted the State's request. However, in addition to her life-and-death testimony, the State used her for other purposes. She testified that Medina never owned a gun and on the night he was killed, she knew he had none on his person, because she needed some money for a date and saw him empty his pockets. This part of her testimony bore upon an important issue in the case, but the court's ruling, reaffirmed upon the conclusion of her direct testimony, precluded the defendant from showing a possible bias for her testimony. Her personal relationship with the prosecutor became relevant when she was asked questions which touched upon a disputed material issue. The accused in a criminal prosecution should be permitted broad latitude in cross-examining State witnesses and the examiner may develop all circumstances tending to explain, qualify or discredit the testimony of an adverse witness. (*People v. Rainford* (1965), 58 Ill.App.2d 312, 208 N.E.2d 314.) When the State violated its promise the court should have changed its ruling.

■■ Another transgression by the prosecutor occurred while he was examining Miss Sanchez. He showed her a photograph of her stepfather with the bullet hole in his face which had been taken in the County morgue. Upon seeing the picture she burst into tears. Although she was the prosecutor's personal secretary, he had not permitted her to see the picture before he placed her on the witness stand, and his abruptly doing so then suggests that he was seeking an emotional reaction. The picture served no other purpose. It was not necessary for the identification of Medina Reyes; that he was the deceased was not disputed. The defendant's attorney protested the use of the picture before it was handed to the witness. His objection should have been sustained.

During the *voir dire* examination the defendant questioned a prospective juror whose husband had been robbed. He asked if there was anything about the robbery, or the fact that Gamboa had been arrested and confined in jail, which would make her believe that Gamboa was guilty. She answered, "No, absolutely not." The attorney tendered the juror and the panel to the State, saying, "* * * this panel of jurors is fully and completely acceptable to the defense." The State's questions brought forth the further disclosure that the juror's husband had been the victim of three armed robberies, two by gun and one by knife. The prosecutor asked if there was anything about these experiences which would cause her to have ill feelings toward the members of the police department. She replied that while the robbers had not been caught neither she nor her husband had any feeling against the police. The State accepted the panel and the court ordered that the panel be sworn.

Prior to the swearing, the defendant's counsel asked for a conference.

The court replied, "Just a moment. Proceed." After the jurors were sworn the court told the lawyers to approach the bench for the conference. The defendant's counsel stated that he had intended to excuse the juror because the State's questioning had revealed that her husband had suffered three armed robberies; that he thought keeping her on the jury would be highly prejudicial and he asked leave to challenge her. The court replied that the State had not broken the panel tendered by the defense, that it had been accepted by both sides and sworn in. The defendant's request was denied.

■■ Neither party has the right to challenge a juror after the juror has been accepted and sworn. (*People v. Curran* (1918), 286 Ill. 302, 121 N.E. 637; *People v. Manns* (1971), 1 Ill.App.3d 871, 274 N.E.2d 194.) But the error here was swearing in the panel before granting the request for a conference. Coming at the time it did, it should have been obvious that the request had something to do with the panel. If the court had not proceeded so peremptorily the objection to the juror could have been heard and acted upon. The error, however, was not "highly prejudicial" to the defendant. The juror had emphatically stated that her husband's experiences would not prevent her from being a fair juror and the defendant's assumption that they would is purely speculative.

■■ The purpose of review in a criminal case is not to determine if the record is perfect but whether the evidence established the defendant's guilt beyond a reasonable doubt and whether he had a fair trial under the law. (*People v. DeSavieu* (1973), 11 Ill.App.3d 529, 297 N.E.2d 336; *People v. Haygood* (1965), 60 Ill.App.2d 70, 208 N.E.2d 373.) Errors that are prejudicial in one case may not be in another. The errors in this case—the two improper arguments of the prosecutor, the restriction placed on the cross-examination of Teresa Sanchez and the emotional response evoked by the contrived display of her father's picture—must be considered in relation to the overpowering evidence of Gamboa's guilt. (*People v. Munday; People v. Colon* (1974), 20 Ill.App.3d 858, 314 N.E. 2d 664.) The proof of guilt was not complicated by a troublesome problem of identification or by a strong alibi which had to be weighed against the possibility of mistaken identification. The shooting of four people was admitted and the theory of self-defense as to two of them—the Reyes brothers—was weak and untenable.

The cumulative errors do not appear to have influenced the jury. The jury acquitted Gamboa of two offenses: it found him not guilty of aggravated battery (the shooting of Marcario Cantu) although there was little doubt of his guilt; it found him not guilty of murdering Miguel Aguilar, despite the fact that he shot him twice in the head and claimed, not that he saw a weapon in his hands, but only that Aguilar struck

him once with his fists. The distinctions the jury made between Gamboa's crimes and victims demonstrate that it was not swayed by the prosecutor's improper arguments, by his misconduct or by the other trial errors. See *People v. Hoggs* (1974), 17 Ill.App.3d 67, 307 N.E.2d 800.

We believe, beyond a reasonable doubt, that the defendant was not deprived of his constitutional right to a fair trial, and his conviction for both offenses will be affirmed. *Chapman v. California* (1967), 386 U.S. 18.

■■■■ The jury found Gamboa guilty of both the attempted murder and the aggravated battery of Gilberto Reyes, but the court sentenced him only for the aggravated battery. Although Gamboa and Gilberto struggled with each other between the first shot fired by Gamboa and the second, the struggle was brief and the two shots were closely related acts within the same transaction. Since the two offenses arose out of the same conduct, the imposition of one sentence was proper, but sentencing Gamboa for aggravated battery instead of attempted murder was contrary to the usual practice of sentencing a defendant for the more serious offense. (*People v. Steen* (1972), 9 Ill.App.3d 488, 292 N.E.2d 513.) In his reply brief Gamboa argues that if his conviction for attempt murder is affirmed, his conviction for aggravated battery must be reversed. The acceptance of this specious argument would enable Gamboa to avoid punishment for either offense. Inasmuch as he was not sentenced for attempted murder, no final judgment has been entered for that offense (*People v. Rose* (1969), 43 Ill.2d 273, 253 N.E.2d 456), and the question of its affirmance or reversal is not before us. However, the appeal is properly before us on other issues and we will use the authority granted to us by Rule 366(5) (Ill. Rev. Stat. 1973, ch. 110A, par. 366(5)), to clear the record by vacating the incomplete judgment entered on the verdict for attempted murder. *People v. Lilly* (1974), 56 Ill.2d 493, 309 N.E.2d 1.

The minimum sentence for aggravated battery—5 to 10 years in the penitentiary—will be reduced to 3 years, 4 months and, as modified, affirmed. The sentence for murder was not excessive in view of the evidence and is affirmed.

Affirmed in part; modified in part and vacated in part.

McGLOON, P. J., and MEJDA, J., concur.