THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ROBERT L. OLEJNICZAK, JR., Defendant-Appellant.

First District (1st Division)    No. 78-802

Opinion filed May 29, 1979.—Rehearing denied June 18, 1979.

Edward M. Genson, Jeffrey B. Steinback, and Marvin I. Bloom, all of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Robert J. Kaiser, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Robert L. Olejniczak, Jr., was found guilty by a jury of rape (Ill. Rev. Stat. 1975, ch. 38, par. 11—1(a)) and indecent liberties with a child (Ill. Rev. Stat. 1975, ch. 38, par. 11—4), and was sentenced to 6 to 18 years in the penitentiary for rape. No sentence was entered on the findings as to the indecent liberties charge.

Defendant argues on appeal that (1) he was not proved guilty of rape beyond a reasonable doubt; (2) he was prejudiced by the prosecutor's closing argument; (3) he was denied a fair trial because the trial judge improperly limited his cross-examination of the complainant; (4) he was denied a fair trial because the trial judge permitted the prosecutor to inquire as to defendant's condition at the time of his arrest; (5) he was denied a fair trial because the trial judge failed *sua sponte* to question the jury to determine whether they had heard or been affected by a statement made; (6) his sentence for rape was excessive; and (7) he was not proved guilty of indecent liberties with a child beyond a reasonable doubt.

Complainant testified that at about 7 p.m. on May 28, 1977, she was riding her bicycle by the corner of Latonia and Churchill Streets in Richton Park. Michael Phelan and Dan Olejniczak, defendant's younger brother, were standing on the corner. Complainant was in school with the boys and had known Michael for approximately three years and Dan for about six months. Michael called to her and she stopped to have a conversation with him.

Complainant was getting back on her bicycle when she saw defendant, Robert Olejniczak, get out of a car. Defendant, whom she had known for about six months, walked over to where she, Michael and Dan were standing. Defendant then picked the lock on her bicycle chain and slipped the chain through one of the belt loops on her blue jeans and also through one of his own belt loops. Defendant immediately locked the chain and, holding the lock in his hand, pulled complainant off the bicycle by tugging on the chain and grabbing her arm.

Defendant and Michael Phelan then dragged her across Latonia Street toward Sauk School, defendant on her left and Michael on her right. She told them to let her go because she was supposed to go home, but defendant said nothing. In front of Sauk School, she saw Brian Alberius, whom she knew, about 1½ blocks away and yelled his name.

Defendant told Michael to check out an abandoned house. Michael did and came back and told defendant that the house was locked and they could not use it. Complainant at this time started struggling with defendant and Michael because she was getting scared and, while struggling, her belt loop with the chain through it broke. She fell and Michael and Dan held her by the arms while defendant put the chain through another of her belt loops.

As the boys dragged her behind the school, complainant again fought to get away and scratched Michael on the arm. She turned to hit defendant, but defendant told her that if she hit him, he would hit her back harder. She was scared and did not hit him. While she struggled, a second belt loop broke and she fell. Michael and Dan held her arms and defendant placed the chain through another belt loop. Complainant at

this time told Michael and Dan they were "too young." She was not, she testified, talking about sex when she said this. This was something she said to people when she was nervous. When she said it to people at school, they walked away and she hoped by saying it in this instance, the same thing would occur.

The boys next pulled complainant toward Sauk Trail. There she saw Brian Alberius again in the park about 1½ blocks away and twice she yelled his name. Defendant still held her by the chain with the lock in his hand. She fought as defendant and Michael pulled her across Sauk Trail. She called for help to a police officer at this time, but he did not hear her and drove away.

Complainant struggled again after being dragged across Sauk Trail and tripped over the curb and broke another belt loop. Dan and Michael held her while defendant placed the chain through a different belt loop. They all then went toward the Baptist Church, with complainant having to lean on defendant because they were chained and because her ankle hurt from falling.

Brian Alberius came up to them on his bicycle when they were behind the Baptist Church and told them they were trespassing. Complainant struggled again to get free, and the belt loop with the chain through it broke. She ran, but was grabbed by Dan and Michael, who pulled her toward defendant. She fell and, while she sat on the ground, defendant put the chain through her halter top. Defendant then pulled on the chain and her halter top came open. She asked Michael to help fix it. Defendant told her if she tried to run away again, he would put the chain around the halter and if the halter broke again, no one would fix it.

Brian left at this time and complainant really started to get scared. She and the boys next came to a field behind the Baptist Church. Defendant saw a fort and asked Michael to check it out. Michael came back and said it was perfect. Defendant asked complainant if she wanted to go to the fort or someplace further away. She told defendant she did not want to go anywhere, except home, and that she was allergic to weeds and would be sick if she went through the field to the fort. Defendant answered that he did not care. Defendant at first offered to carry her, but then he and Michael decided to drag her through the field. They did not pull her by the chain this time, because the chain had been put back on her bicycle, which Dan had brought along. She received a cut on her leg while being dragged through the field.

The fort they arrived at, complainant testified, had three sides. On the floor of the fort was a pallet with a mattress on it. Someone immediately knocked her down on the mattress. Michael then got on top of her so she could not get up, while defendant was on one side kissing her, and Dan was on her other side. Dan attempted to unzip her pants, but

she fought to get them up. She scratched Michael, who jumped up and told her to "knock it off" because he was getting "cut up." Defendant then asked her how old she was and she told him she was 15. She then asked them to let her go, but defendant said they had to have some fun on a Saturday night and there were no other girls around. She was scared and fought to free herself. Defendant asked her whether she would rather have "them two or me." Complainant answered "neither" and continued to struggle.

Defendant then told Michael and Dan to leave the fort and they did, but they were mad. Defendant next told complainant she could be out of there in 10 minutes if she would have intercourse with him. She answered defendant that she did not want to have intercourse, that she did not approve of it, and that she was having her period.

Defendant began to undress her. She was frightened and tired from fighting and "didn't know what to do anymore." She begged him to stop. Defendant told her that if she did not have intercourse with him when he asked "nicely," he would tell Michael and Dan to come in and they would have intercourse with her without asking. She continued to fight and plead with defendant to stop, but defendant took her pants off and had intercourse with her. Dan and Michael then came into the fort. Complainant panicked, she said, as Dan got on top of her. Dan could do nothing, but then Michael got on her and had intercourse with her. Then Dan got on and he too had intercourse with her, while defendant and Michael left. Afterwards, Dan helped her to get dressed and got her bicycle for her.

At this time, complainant testified, she was scared and did not know if she should ride right home or go to the police station. She decided it would be better to go home, so she rode her bicycle past the police station straight home. When she arrived at her home, she was crying and very upset. She ran inside and yelled for her mother, tripping over a fan. She found her mother and said, "Three guys got me." Her mother responded, "What do you mean three guys got you? They beat you?" Complainant answered, "No, the other." Her mother then told her to go to the bathroom to clean up and calm down, while she called the police. Complainant did not have her sanitary napkin at this time and did not know where it was.

Soon afterwards, complainant stated, the police arrived at her house. After she talked to the police, she went to South Suburban Hospital, where a series of tests were performed on her. She gave the clothes she was wearing to her mother, who gave them to the police.

Complainant further testified that defendant and Michael never hit her and that she had no bruises on her arms, but did have bruises on her back the next day.

Brian Alberius was a witness for the State. He was 18 years old at the

time of the trial. Brian testified that around 6:30 p.m. on May 28, 1977, he was in a park on Sauk Trail Street in Richton Park. There he saw complainant, whom he had known for four years, crossing Sauk Trail Street with Michael Phelan, Dan Olejniczak and defendant. Brian was about 500 feet away from them. He noticed that there was a chain through complainant's belt loop and that defendant was holding the chain. He also saw complainant trip over the curb as she and the boys were crossing Sauk Trail, and that she was helped up by the three boys.

Brian then noticed that complainant and the boys were going toward the back of the Baptist Church, and he rode his bicycle over there. Behind the Baptist Church he saw defendant holding complainant, who was crying and said, "Brian, please help me." Brian told the boys they were trespassing on church property. Defendant told him that he did not care, and Michael Phelan said, "Let's go to the fort." Brian stood there at this time, frozen. He saw a chain through one of complainant's belt loops and around defendant's waist. Complainant attempted to get away, which caused her belt loop to break. Complainant tripped and Michael and Dan grabbed her. Defendant put the chain through her halter top. Brian testified he was about 25 feet away when this happened. Complainant tried to get away again, and her halter came loose, exposing her breasts.

Brian further testified that he saw defendant, Dan and Michael start toward the fort with complainant. Brian then got on his bicycle and left. He was frightened for complainant's safety, but he did not go to the police because he was scared of the three boys. Later that evening, around 10 p.m., the police came to him and asked him to come with them to the police station and make a statement, which he did.

Complainant's mother testified for the State. She said that at approximately 9 p.m. on May 28, 1977, her daughter came crying into their house, tripping over a fan. Her daughter then said, "Three boys got me." She answered her daughter, "What do you mean? Were you beaten up?" Her daughter responded, "No, the other." She knew her daughter was having her period at this time and she told her to go onto the bathroom and take care of herself. Complainant's mother testified that she immediately phoned the police, who came right over. After the police came, she took her daughter to the hospital.

Officer Daniel Mackiewicz of the Richton Park Police Department testified that at 9:09 p.m. on May 28, 1977, he arrived at the complainant's house with Officer Wiedeman. There he spoke with complainant and her mother. Complainant was extremely upset and crying, and she was wearing a pair of blue jeans. Officer Mackiewicz did not notice any bruises on her. About ten minutes after he arrived, complainant's mother and Officer Wiedeman took her to South Suburban Hospital.

That evening, around 9:30, Officer Mackiewicz found Brian Alberius

in the park and took Brian to the police station. Later that same evening, he arrested Michael Phelan and Dan Olejniczak and took them to the police station. At the station, he took their jockey shorts, identified by him as exhibits, and saw that they had reddish brown stains on them. The next day he arrested defendant.

Richard Labus, a detective youth officer for the Richton Park Police Department, testified that he was called about 9:09 p.m. on May 28, 1977, to investigate the incident involving complainant. He first met complainant and her mother that evening when they were at the hospital. Complainant's mother gave him her daughter's pants, panties and halter top, which he identified as State exhibits. He did not speak with complainant at the hospital nor did he see any physical injuries on her at that time. Later that night he saw Michael Phelan at the police station. He noticed that Phelan had scratch marks on his left forearm.

The next morning, Detective Labus testified, he arrested defendant. He did not notice any scratches or bruises on defendant at this time. At the police station Detective Labus said defendant's jockey shorts, identified by him as an exhibit, appeared to have dried blood on them. Around 7:30 that same morning he went to the fort in the field behind the Baptist Church. The fort had three sides, and a pallet with a rubber mat on it, and some rats were running underneath. The closest residence to the fort was two blocks away. When he was at the fort, Detective Labus recovered a Kotex pad, which he identified as an exhibit.

Defendant, Robert Olejniczak, testified in his own behalf. Defendant stated that on the evening of May 28, 1977, he was with complainant and that she was wearing jeans and a halter. Defendant identified the jeans as an exhibit, and admitted that some of the belt loops on the jeans were broken by a bicycle chain which he had put through the loops and pulled complainant with. Defendant stated that one loop broke when complainant tripped. After this loop broke, he put the chain through another loop and held it while he, complainant, Michael and Dan moved in the direction of the fort. Defendant said complainant was walking with them at this time, and that he was not dragging her. He admitted that somewhere along the way to the fort, another loop broke and he had to put the chain through a different loop. Defendant maintained, however, that the chain did not come off because complainant tried to get away or because he pulled on the chain. Defendant further testified that on their way to the fort they met Brian Alberius, but denied that complainant asked Brian for help. Defendant knew Brian, but did not know he was somewhat mentally retarded or that he attended special education classes.

During cross-examination, defendant at first stated that he saw complainant's halter top come off as they went toward the fort. Defendant

subsequently testified that the halter top did not come off. Later, on cross-examination, defendant admitted that before complainant's halter top came off, the chain was through the halter and he was holding the chain. Defendant denied, however, that he pulled the halter off or that he knew how it came off. He also denied that he told complainant that if she tried to hit him, he would hit her back harder.

Defendant further testified that he, complainant, Michael and Dan arrived at the fort about 7 p.m. According to defendant, he and complainant then had a conversation, in which complainant told him she did not want Michael and Dan around because they were too young. He asked complainant how old she was. When she said 16, he ordered Michael and Dan to leave the fort. After this, he and complainant talked for a while and she agreed to have sex with him. He helped her undress and proceeded to have intercourse with her, but he did not force her, or hit or threaten her.

Defendant further testified that after having intercourse, he got dressed and left complainant in the fort. He knew Michael and Dan were around, but did not know where they were or that they would come into the fort to have intercourse with complainant.

It was stipulated that the nurse who examined complainant at the hospital on the night of the incident would, if called as a witness, testify that she observed no bruises or lacerations over complainant's thighs or labia. It was also stipulated that the doctor who examined complainant at the hospital would testify that he observed no external injuries except an abrasion on her right thigh, and that there was blood in her vagina due to the fact that she was having her period. It was further stipulated that an analysis by the State of Illinois Crime Laboratory revealed seminal material on complainant's jeans and panties, as well as both seminal material and menstrual blood on her Kotex pad and on the jockey shorts belonging to Michael Phelan, Dan Olejniczak and defendant.

Defendant contends that the evidence was insufficient to prove him guilty of rape beyond a reasonable doubt.

■■ The function of a reviewing court in rape cases is succinctly stated in *People v. Reese* (1973), 54 Ill. 2d 51, 57-58, 294 N.E.2d 288:

> "Courts of review have a special duty of carefully examining the evidence in rape cases. (*People v. Qualls*, 21 Ill. 2d 252.) But in doing so the court may not encroach upon the function of the trier of fact to weigh credibility and otherwise assess the evidence which was presented. (*People v. Springs*, 51 Ill. 2d 418.) That evidence has been conflicting will not justify a reversal of a finding by the trier of fact. (*People v. Springs*, 51 Ill. 2d 418; *People v. Hiller*, 7 Ill. 2d 465.) A court of review will not set aside a finding of guilty unless the evidence is so palpably contrary to the finding or so

unreasonable, improbable or unsatisfactory as to cause reasonable doubt as to the guilt of the accused. *People v. Sumner*, 43 Ill. 2d 228."

■■ There are no fixed standards for determining how much force from a defendant and resistance by a complainant is necessary to establish that the defendant committed rape. (*People v. Sweeney* (1977), 46 Ill. App. 3d 858, 865, 361 N.E.2d 344, 349: *People v. Barksdale* (1976), 44 Ill. App. 3d 770, 775, 358 N.E.2d 1150, 1154.) Each case must be decided on its own merits. A conviction in a rape case "will be sustained based on the uncorroborated testimony of the victim if her testimony is clear and convincing. * * * Otherwise her testimony must be corroborated." *People v. Sweeney* (1977), 46 Ill. App. 3d 858, 865, 361 N.E.2d 344, 349.

We have carefully examined the evidence in this case and find that not only was the testimony of the complainant clear and convincing, but also her testimony was corroborated by other witnesses. Defendant was proved guilty of rape beyond a reasonable doubt.

Defendant contends that he was deprived of a fair trial because the prosecutor improperly gave his personal opinion several times during closing argument. The prosecutor told the jury he wanted them to look at the photographs of the fort and consider whether it was likely complainant would consent to intercourse in such a "rat infested place." He also said, "I guarantee all of you will agree that not even a rat deserves to be raped in that place, not even a rat * * * [m]uchless a fifteen year old human being." Defendant's objection to this comment was overruled by the trial court.

Defendant was not prejudiced by these remarks. A prosecutor is allowed great latitude in his closing argument. (*People v. Oliger* (1975), 32 Ill. App. 3d 889, 893, 336 N.E.2d 769, 772.) Furthermore, "[s]ince the trial judge has a superior opportunity to determine the propriety of the argument, these issues are generally left to the trial court absent a clear abuse of discretion." (*People v. Carroll* (1977), 49 Ill. App. 3d 387, 395, 364 N.E.2d 408, 415.) Moreover, while a prosecutor may not offer a purely personal opinion during his closing remarks, he may argue or express an opinion concerning relevant issues when his opinion is based solely on the evidence and inferences fairly drawn from it. *People v. Goolsby* (1977), 45 Ill. App. 3d 441, 448, 359 N.E.2d 871, 876; *People v. Franklin* (1976), 42 Ill. App. 3d 408, 416, 355 N.E.2d 634, 641; *People v. Oliger* (1975), 32 Ill. App. 3d 889, 893, 336 N.E.2d 769, 772.

■■ In view of the overwhelming evidence against defendant, these remarks, even if improper, constituted harmless error beyond a reasonable doubt. In addition, the court instructed the jury to consider only the evidence presented and that closing arguments are not evidence,

so that any statements made in argument not based on the evidence should be disregarded. (Illinois Pattern Jury Instructions, Criminal, No. 1.01 and No. 1.03 (1968) (hereinafter cited as IPI Criminal No. 1.01 and IPI Criminal No. 1.03).) Such instructions have been held to cure any possible prejudice from a prosecutor's improper remarks in closing argument. *People v. Brown* (1974), 18 Ill. App. 3d 1049, 310 N.E.2d 498.

Defendant also contends that he was further prejudiced by the following comments by the prosecutor which interjected his personal assessment of the defense theory of consent and personally vouched for the credibility of the State's witnesses:

"All along I have been trying to figure it * * * the defense's theory of the facts elicited [and] I heard the most overwhelming theory I ever heard in my career.

Mr. Caprio [defense counsel] says what really occurred here is, apparently [complainant] got upset, and after dragging her with the chain, and broke [*sic*] her clothes, and ripped [*sic*] her halter off, she went back and consented to intercourse with him, and then he left after this beautiful sensual relationship and act, left, and then what happened, these two kids came over, and those two kids, apparently, raped her, and that's why she was upset."

* * *

Mr. Caprio acts like he's got some secret knowledge or something, says to you,—I'm telling you Detective Labus didn't lie, I'm telling you that Mackiewicz didn't lie. Well, maybe I possess the same power, I'm telling you [complainant] didn't lie either."

■■ These remarks were legitimate argument. A prosecutor may state his opinion concerning a defendant's guilt and whether the defense's theory of what happened is plausible, provided his opinion is based on the evidence and inferences fairly drawn from it. (*People v. Owens* (1977), 46 Ill. App. 3d 978, 994, 361 N.E.2d 644, 656; *People v. Goolsby* (1977), 45 Ill. App. 3d 441, 448, 359 N.E.2d 871, 876.) This is what the prosecutor did by the first quoted statement. The second comment was in reply to defense counsel's statement:

"This case falls down between two people, and two people alone, and that's [complainant] and [defendant]. Officer Mackiewicz, obviously, didn't lie. Officer Labus didn't lie when he was on the stand. I'm telling you he didn't lie, none of them lied. Nurse Tilsey, she didn't lie, the two doctors, that the stipulation was entered into, didn't lie."

The prosecutor's argument was proper comment, as it was invited by defense counsel's remarks. *People v. Benedik* (1974), 56 Ill. 2d 306, 307 N.E.2d 382; *People v. Bolton* (1976), 35 Ill. App. 3d 965, 343 N.E.2d 190.

Defendant also contends that the prosecutor improperly commented

on defendant's failure to call certain witnesses. The prosecutor, in closing argument, stated that the defense had not called Michael Phelan and Dan Olejniczak as witnesses "because they knew what they would say." Defendant argues that this comment was improper and deprived him of a fair trial.

■■ Generally, "[i]t is improper for a prosecutor to comment on a defendant's failure to call a witness where the comment suggests that the witness would have testified unfavorably to the defendant and the witness is as accessible to the State as he would be to the defendant." (*People v. Gamboa* (1975), 30 Ill. App. 3d 242, 250, 332 N.E.2d 543, 549.) When alibi witnesses are injected into the case by defendant, however, they "are deemed unavailable to the prosecution and comment with regard to the failure of such witnesses to testify is proper." *People v. Mays* (1972), 3 Ill. App. 3d 512, 514, 277 N.E.2d 547, 548.

■■ The State argues that defendant injected Michael Phelan and Dan Olejniczak into the case. The State bases this argument on the fact that the prosecutor asked defendant on cross-examination if these two boys would know if complainant had consented to the events which had occurred, and defendant replied that they would know. We agree with the court in *People v. Mays* (1972), 3 Ill. App. 3d 512, 516, 277 N.E.2d 547, 549, however, that most of the cases in which it was held proper to comment on defendant's failure to call witnesses involved situations where potential witnesses who would support defendant's theory of the case were injected by defendant or a defense witness on *direct examination.* We further agree with that court that when such potential witnesses are elicited from defendant on cross-examination, "the responsibility for the failure of the defendant to produce such witnesses can not be assessed against the defendant or [have] the same significance as when the defendant himself refers to such potential witnesses in an apparent attempt to bolster his defense." (*People v. Mays* (1972), 3 Ill. App. 3d 512, 516, 277 N.E.2d 547, 549.) To conclude otherwise would make it too easy for the prosecutor to circumvent the rule against commenting on defendant's failure to produce witnesses.

■■ The comment by the prosecutor on defendant's failure to call the other two boys as witnesses was improper, but was harmless error. (See *People v. Beller* (1979), 74 Ill. 2d 514, 386 N.E.2d 857; *People v. Gamboa* (1975), 30 Ill. App. 3d 242, 332 N.E.2d 543.) In the instant case, the trial judge sustained objection to this comment and later gave IPI Criminal No. 1.01 and IPI Criminal No. 1.03. This reduced the chance the comment would have any prejudicial effect on defendant's right to a fair trial. Also, the evidence that defendant was guilty of rape was so strong that any error could not have contributed to defendant's conviction for rape. Furthermore, the jury was well aware from complainant's testimony that

Michael Phelan and Dan Olejniczak had taken part in the incident. Therefore, it is reasonable to suppose that even if the prosecutor had not made this comment the jury might have drawn an inference negative to defendant from his failure to have the other two boys testify. Finally, defense counsel to a certain extent invited the comment, because earlier in closing argument defense counsel had stated that Brian Alberius was the only occurrence witness. Based on the foregoing reasons, we feel the prosecutor's comment on defendant's failure to call the other two boys as witnesses was harmless beyond a reasonable doubt.

■■■ Defendant urges that the prosecutor made several other improper remarks which were so inflammatory that they prejudiced his defense. According to defendant, one occurred when the prosecutor said the theory that complainant may have been raped by Michael Phelan and Dan Olejniczak, but consented to intercourse with defendant, was "nonsense" and "I can't believe it came from the Defense Attorney's mouth." It was also improper, defendant maintains, for the prosecutor to state defendant was "programmed" so he "knew what to say" on cross-examination, but that the "script didn't go quite according to plans." Defendant also claims reversible error was committed when the prosecutor told the jury that, in determining which witnesses to believe, they should remember defendant was "* * * a convicted thief, punk, joking and clowning during this trial." In addition, the prosecutor argued to the jury that the efforts complainant had gone through to achieve justice, including appearing in juvenile court, showed she was sincere. Defendant objected at the time to the reference to complainant's appearance in juvenile court and now urges that this remark was reversible error. Finally, defendant believes it was improper for the prosecutor to make remarks to the effect that complainant's father would have liked physically to attack the person who raped his daughter, but he and his wife instead were trusting the criminal justice system to deal with him.

We do not condone the remarks made and it would have been better if they had been left unsaid, but the overwhelming evidence against defendant makes it clear that they did not contribute to the jury's finding of guilty of rape.

■■■ Defendant also asserts that he was prejudiced when the trial court sustained an objection when complainant was asked whether she had ever been to defendant's house. This contention is without merit. Even if she had been there, that fact would have no probative value on whether she consented at the time of the incident. See *People v. Dery* (1966), 74 Ill. App. 2d 112, 219 N.E.2d 536.

Defendant also argues that a question asked by the State of Detective Labus on redirect examination deprived him of a fair trial. On direct

examination, Detective Labus testified he arrested defendant on the morning after the crime. On cross-examination, defense counsel asked whether he had physically examined defendant at the police station that morning. When Detective Labus answered that he had not, defense counsel asked whether he had seen any bruises or scratches on defendant that morning, to which Detective Labus answered he had not. On redirect examination, the prosecutor asked Detective Labus whether defendant was under the influence of alcohol or narcotics at the time of his arrest. Detective Labus replied defendant did seem under the influence of one of these substances. Defendant argues that this question on redirect was improper and deprived him of a fair trial. The State contends that defense counsel opened the door to this question by previously asking Detective Labus whether he had physically examined defendant after the arrest.

■■ It is well settled that the scope of redirect examination generally is limited by the scope of the preceding cross-examination. (*People v. Howell* (1977), 53 Ill. App. 3d 465, 469, 368 N.E.2d 689, 692.) When defense counsel asked Detective Labus whether he had physically examined defendant after the arrest, the question was intended to elicit evidence on the issues of force and consent and only opened the door for redirect questions on these issues. This is shown by defense counsel's follow-up questions concerning whether Detective Labus noticed any bruises or scratches on defendant that morning, approximately ten hours after the incident. Defendant's condition of intoxication at that time had no probative value on the question of consent or force. Its effect was prejudicial and the objection to it should have been sustained.

In view, however, of the overwhelming evidence of defendant's guilt, the question and the response thereto were harmless error. They could not have contributed to the jury's verdict.

During trial, the prosecutor, outside the presence of the jury, informed the trial judge that while complainant was testifying he thought he had heard someone in the area of the alternate jurors say "sickening" or "this is sickening" and that when he turned in that direction he saw Deputy Stefansky talking to Deputy Scott. Deputy Stefansky then told the trial judge that all he had said to Scott was that he thought Deputy Moran had gone home. When the trial judge asked Stefansky if he had heard anyone say "sickening," Stefansky answered, "No. Nobody said anything like that." The trial judge then said that because of the seriousness of the trial even the deputies had to be very careful and told Stefansky if he wished to be a spectator he could sit in one of the seats for spectators "[o]ut of earshot of the jury." Deputy Stefansky replied, "I never heard nobody say 'sickening.' Maybe somebody else, but not Scott or myself."

■■ Defendant urges that he was denied a fair trial because the trial

judge failed *sua sponte* to inquire of the jury whether any had heard or been affected by the statement "sickening." Because defendant made no objection at trial concerning the manner in which the trial judge dealt with this incident and did not raise the point in his motion for a new trial, the objection is waived and we will not consider it. (*People v. Ford* (1960), 19 Ill. 2d 466, 168 N.E.2d 33, *cert. denied* (1960), 364 U.S. 848, 5 L. Ed. 2d 72, 81 S. Ct. 93; *People v. Seidel* (1975), 33 Ill. App. 3d 901, 338 N.E.2d 567.) Furthermore, defendant has failed to show that he was prejudiced by an unauthorized communication to the jury. *People v. DuPree* (1977), 48 Ill. App. 3d 1063, 363 N.E.2d 910.

■■ Defendant further contends that his sentence of six to 18 years on the rape verdict was excessive because the evidence showed he did not beat complainant, and also because he was 17 years old. The sentence imposed did not exceed the statutory limit (Ill. Rev. Stat. 1977, ch. 38, pars. 11—1(c), 1005—8—1(b)(2)) and we will not disturb it. In *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882, the supreme court said (68 Ill. 2d 149, 153):

> "* * * [O]ur decisions have firmly established that the imposition of a sentence is a matter of judicial discretion and that, absent an abuse of this discretion, the sentence of the trial court may not be altered upon review."

We do not find any abuse of judicial discretion.

■■ Finally, defendant argues that he was not proved guilty beyond a reasonable doubt of indecent liberties with a child and that we should therefore reverse his conviction on this charge. We need not consider this contention because the offense of indecent liberties with a child arose from the same act as the offense of rape. Under those circumstances defendant cannot be convicted and sentenced on both charges. (*People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1.) The jury found defendant guilty of both offenses, but the court sentenced defendant only on the rape charge. Under *Lilly*, we vacate the conviction for indecent liberties with a child.

Defendant's conviction and sentence for rape are affirmed; the conviction for indecent liberties with a child is vacated.

Conviction and sentence for rape affirmed; conviction for indecent liberties with a child vacated.

GOLDBERG, P. J., and McGLOON, J., concur.