THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
GERALD POZZI, Defendant-Appellant.

Second District (2nd Division)   No. 75-465

Opinion filed October 8, 1976.

Julius Lucius Echeles and Carolyn Jaffe, both of Chicago, for appellant.

Gerry L. Dondanville, State's Attorney, of Geneva (Phyllis J. Perko, of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

The defendant was charged with delivery of a controlled substance, in that he knowingly delivered more than 30 grams of a substance containing LSD. He was tried by a jury, convicted and sentenced to not less than 4 nor more than 6 years in the penitentiary.

■■  The defendant raises five issues in this appeal, three of which do not require extended consideration. One of these issues, having to do with the constitutionality of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1973, ch. 56½, par. 1100 *et seq.*), has in the meantime been decided adversely to the defendant's contention by our Supreme Court in *People v. Mayberry* (1976), 63 Ill. 2d 1, which upheld the Act's constitutionality. Another point raised by the defendant—that the word "knowingly" in the Controlled Substances Act does not contemplate a conviction for the delivery of a controlled substance other than that which the defendant *intended* to deliver—is pre-empted by this court's decision in *People v. James* (1976), 38 Ill. App. 3d 594 (defendant's co-indictee), where we held that the legislature did not intend conviction under the Act to depend on the defendant's state of knowledge as to the precise nature of the controlled substances actually delivered.

■■  A third point of appeal we may also dispose of summarily. The defendant contends he was subjected to double jeopardy because he was indicted jointly with James and there was never any motion made for severance of his case from that of his co-indictee, James. The defendant was present in court at the trial of James and there having been no severance the defendant argues that he was actually "on trial" together with James in the latter's case. He contends that under the circumstances, since the James' jury did not return a verdict against him, they in effect acquitted him and his subsequent trial therefore constitutes double jeopardy. We do not consider this a tenable argument. It obviously was not the intention of the State to try the defendant jointly with James. We do not consider the mere fact that the defendant was sitting in the courtroom at the trial of James to constitute the trial a "joint" trial. The defendant may be entitled to a severance for good reason shown but this principle does not require the State to try all joint defendants jointly simply because there was no motion for a severance made by the

defendant. The defendant was not placed on trial in the James case and would very likely have had cause to ask for a severance if he had been. In any case he was not subject to double jeopardy and we find this argument to be without substance.

We also note the defendant's question raised concerning the chain of evidence by which the substance in question was identified in court, as being the same substance which was delivered to the undercover agent in question. (See *People v. Resketo* (1972), 3 Ill. App. 3d 633; *People v. Scott* (1973), 22 Ill. App. 3d 770.) The State contends this issue is waived by the failure of the defendant to raise it at the trial or on the post-trial motion (*People v. Pruitt* (1974), 16 Ill. App. 3d 930.) In view of our resolution of the remaining issues we do not determine whether the effect of the defendant's failure to object to the chain of evidence at trial or in post-trial motions foreclosed the issue. A new trial may not produce the same evidentiary situation.

We turn now to the two questions which still remain in this appeal. First, whether the trial court abused its discretion in excluding the testimony of a defense witness, Terry Williams, and second, whether the alleged remarks of one of the jurors during the jury's deliberations, indicated such prejudice in the juror, existing prior to the deliberations, as to deprive the defendant of a fair trial.

To appreciate the ramifications involved in the trial court's ruling precluding Terry Williams from testifying for the defendant, it is necessary to briefly reconstruct the factual background of the case. The defendant was a friend of Larry James, his co-indictee. He testified that on the night when the alleged delivery of LSD took place he had gone to Topps Restaurant, with another friend, Terry Williams. While the defendant was at Topps eating a sandwich he saw his friend, Larry James, there at a nearby booth. He testified he had not arranged to meet James and he did not expect him to be there but had gone to Topps after having been shopping with Williams. He had known James since his high school days but had not seen him for about a week prior to the meeting at Topps. According to the defendant's testimony, James, upon seeing them, came over and sat with the defendant and Williams at their booth. He then offered the defendant and Williams some chocolate mescaline to "try" and they both took it and ate it. James, according to the defendant, then mentioned that the price of the mescaline was two dollars a piece but the defendant and Williams did not pay him anything. James, according to the testimony, then got up and went to the front of the restaurant and about 25 minutes later came back to the defendant's table and said he wanted the defendant "to meet some people, some of my friends." The defendant testified he accompanied James to a table where were seated two other people, one of whom he knew as Roger Anderson. James

proceeded to introduce the other man to the defendant as "Tony" and introduced the defendant to Tony as his "partner, Gerry."

The defendant testified that Tony (who was actually DeFranco, an undercover Narcotics Bureau agent, brought there by the other member of the group, Anderson), then inquired as to "how good the stuff was." The defendant testified he answered that it was good but that in saying this he was under the impression that Tony (DeFranco) was referring to the chocolate mescaline he and Williams had just sampled at James' behest. After a moment or two of further conversation, according to the defendant's testimony, James and DeFranco then got up and left the table and went outside. They returned in about five minutes. Shortly after that the group broke up and Terry Williams and the defendant left the restaurant. According to the defendant that was all the conversation he had with either DeFranco or James—he testified he talked briefly to Anderson regarding some needed repairs to his car (Anderson being connected, the defendant said, with a service station).

DeFranco's testimony—which was the entire substance of the State's case—was to the same effect except that his testimony added some additional words to the conversation he had with the defendant at the table. He testified that when he inquired as to the quality of the mescaline (generally, to the whole table) that the defendant stated that he and James "had traveled to Rockford the day before and purchased the mescaline for 40 cents a hit." DeFranco said the defendant said it was good quality and that DeFranco then asked him how he knew, to which the defendant replied that so far nobody had complained about it. It is on these alleged words, that is that the defendant and James had traveled to Rockford the day before and purchased the mescaline for 40 cents a hit and that nobody had complained about it, together with the fact that James had introduced the defendant as his "partner" that the State rests its case against the defendant on a theory of accountability.

A serious question arises, however, as to the authenticity of DeFranco's testimony as to this critical conversation by reason of the fact that admittedly he made no reference to such conversation in his report written just after the alleged conversation took place. There was no explanation of this omission in DeFranco's testimony at trial.

On pretrial discovery the defense did not list Terry Williams as a witness. However, following a favorable ruling *in limine* by the court to the effect that the defendant's past convictions could not be used to impeach him if he took the stand in his own behalf, defense counsel informed the State's Attorney that he intended to call Williams as a witness. The State had previous knowledge that Williams had been at the scene and actually had had his record checked for possible narcotics' violations. Defense counsel, in tendering Williams as a witness for the

purpose of corroborating the defendant's testimony, offered the State full opportunity to discover beforehand what the substance of his testimony would be. Williams would not have been called to testify until the next day which would have allowed 24 hours for the State to ascertain the substance of his testimony. Defense counsel explained to the trial court that initially he had not listed Williams as a witness because Williams was only a corroboratory witness and if defendant had not been successful with the *in limine* motion to exclude the defendant's previous record if he testified, there would have been no reason to call Williams, his testimony being worthless unless the defendant also testified. The State, however, objected that it was taken by surprise, that it would be given only one day to check Williams' record and that it would thus be prejudiced. The trial court, referring to Supreme Court Rules 413(d) and 415(g) (Ill. Rev. Stat. 1973, ch. 110A, pars. 413(d) and 415(g)) ruled that Williams could not testify.

There is some question whether the facts related above constituted a violation of Supreme Court Rule 413(d)(i) as contended by the State. The rule requires the defense to disclose the names and addresses of all "persons he intends to call." The facts related above indicate the defense did not form the intention of calling Terry Williams until the favorable *in limine* ruling of the court in connection with disclosures of his past record made it tactically permissible to call the defendant in his own behalf, thus giving scope to the corroboration by Williams.

In any event, however, considering this ruling in the context of the facts related above and giving all deference to the discretion with which the trial court is clothed in enforcing the provisions of Supreme Court Rules 413(d) and 415(g), we are of the opinion that the circumstances did not justify the exclusion of the witness's testimony. Had the State's case been overwhelming or even strong, such an abuse of discretion on a difficult point might be looked upon as harmless error. But, in a criminal case where the prosecution depends entirely on a few words allegedly spoken by the defendant, words denied by the defendant and not contained in the agent's original written report—and where the import of such words must be construed in a certain manner to determine a guilty meaning— the background facts may be of crucial significance. Thus, any testimony tending to allay the guilty implication ascribed by the prosecution to such facts may have weight and influence beyond their scope in the ordinary case. The testimony of Williams would probably, at least to some extent, have corroborated the defendant's story of the transaction in question. In his closing argument the State's Attorney made strong implications to the effect that the defendant was at Topps Restaurant by pre-arrangement to help in the sale of the drug. The testimony of Williams might have helped the defendant in countering the State's theory of the case based on this

argument. For example, when the defendant answered a question by DeFranco by saying it was "good stuff" was he trying to promote a bulk sale of a controlled substance or was he simply making a casual response as to the sample bar of chocolate mescaline he had just been handed by James?

Also to be considered is the fact that the State claimed to be unable to locate the fourth witness to the transaction—Anderson—the informer. The testimony of Officer DeFranco, elicited by defense counsel brought out the fact that the Illinois Bureau of Investigation had sent Anderson to Minnesota, but while the IBI had paid his way there they were unable (or unwilling) to furnish information as to his whereabouts. Thus, two vital witnesses were excluded and the jury heard only DeFranco and the defendant as to the content of the conversation which was relied upon to prove the defendant's accountability.

Bearing in mind that there was a question, not only whether the words were spoken at all, but what the inference to be derived from them was, even if they were spoken, it appears to us it did not serve the ends of justice to allow the question to go to the jury without the testimony of either Williams or Anderson to throw light on the actual utterance of the words in question or the legitimate implication to be derived from their circumstances, if they were indeed spoken.

■■ While the State contended it would be prejudiced by the witness's late appearance in the trial, it was offered ample opportunity to interview Williams before the trial resumed and we cannot discern where substantial prejudice would have been sustained. We note that it would not be unusual for a prosecution witness to be allowed to testify without having been previously listed, if the State had a logical excuse for the failure to disclose him previously. In our opinion, the trial court abused its discretion in refusing to allow Williams to testify.

Another issue raised by the defendant must be given close consideration. Following the trial and the jury's verdict of guilty, defense counsel, at the hearing on the post-trial motions, raised a question as to misconduct of one of the jurors. This question was on an affidavit of the foreman of the jury. Defense counsel was allowed to make an offer of proof (the juror being available to testify), that if allowed to testify the juror would testify that during the course of the trial of this case (being the People of the State of Illinois v. Pozzi, 74 CF 13892) a fellow juror approached her and another female juror and started a conversation wherein the male juror said words to the effect that "this fellow has a prior conviction in cases of this kind"; that this occurred prior to the jury's deliberations; that subsequently, but still prior to the jury's deliberations, this same juror came to the witness and apologized for having made the remark; and, that further, this juror had considerable to say to the other

jurors throughout the course of the trial about his personal knowledge of various considerations insofar as the police department of Aurora was concerned, and that he constantly bragged about his connections with the Police Association.

■■ Defense counsel then attempted to call the juror-witness to testify but upon objection by the State the court refused to allow the witness to testify on the ground that it would violate the well-established Illinois rule of law that a juror will not be allowed to impeach his own verdict. A second offer of proof was then made as to what the testimony of the actual, errant, juror (who was present and available) would be and it was indicated the testimony would be to the same effect, as well as to the further effect that this juror learned or knew facts prejudicial to the defendant prior to the jury deliberations which he did not reveal to the court on his voir dire and that he did tell other jurors these facts. Again, the offer of proof was refused for the same reason.

While the general rule is well established in Illinois that a juror will not be heard to impeach his own verdict, this rule is not so all-encompassing as to preclude any and all testimony denoting irregular conduct by the jury in all cases. The rule is a sound one, designed to secure the finality of a verdict and set the matter at rest without further wrangling, second guessing or change of heart resulting from influence brought to bear after the verdict. At the same time a jury trial is designed to accomplish justice and where there is a distinct possibility that a juror or jurors were prejudiced as to the defendant by facts learned prior to the beginning of deliberations, it has been held that a fair trial was not achieved and a new trial should be granted. Thus in the United States Supreme Court case of *Marshall v. United States* (1959), 360 U.S. 310, 3 L. Ed. 2d 1250, 79 S. Ct. 1171, the court ordered a new trial on the ground that newspaper articles indicating a previous conviction of the defendant for the same offense were disclosed to the jury and discussed in the jury room. In *People v. Ortiz* (1926), 320 Ill. 205, where a remark showing actual prejudice prior to being sworn as a juror was made by one of the jurors, the Illinois Supreme Court ordered a new trial, saying, page 212:

> "If the existence of certain facts has been established in his [the juror's] mind to the extent of producing conviction he is disqualified, for neither party should be put to the necessity of adducing proof to remove a preconceived opinion."

In *People v. Mooney* (1922), 303 Ill. 469, a new trial was granted on the basis of an affidavit showing that one of the jurors was also a member of the previous indicting grand jury.

It is clear, therefore, that while the general rule is that a juror is not allowed to impeach his own verdict this general rule does not apply so as to prevent a new trial where the facts indicate actual prejudice existed in a

juror's mind or extraneous matter not germane to the issue at trial was introduced during deliberations to the prejudice of the defendant. Thus, it was said in *People v. Cravens* (1941), 375 Ill. 495, 497:

> "A juror, to·be qualified, must come into the trial of the case with a mind uncommitted on the question of guilt or innocence of the defendant and prepared to weigh the evidence impartially. If the existence of certain facts has been established in his mind, touching the guilt or innocence of the accused, to the extent of producing a conviction, he is disqualified, for neither party to the proceeding should be required to adduce proof to remove a preconceived opinion."

*People v. Nuccio* (1973), 54 Ill. 2d 39, cited by the State as supporting the general proposition that jurors cannot impeach their own verdicts, is not dispositive of the issue here. In that case jury contamination was charged by the defendant, grounded on the claim that several of the jurors had discussed the fact that the defendant had previously been convicted on the same charge. On the motion of defense counsel a hearing was conducted at which defense counsel requested that the judge examine certain jurors regarding this allegation. Objection was made on the ground that it was not claimed that the alleged discussions by the jurors in question took place prior to reaching the verdict. The investigator who supplied the impeaching affidavit then took the stand and his testimony indicated that at least one of the jurors had learned of the previous conviction *after* the jury's deliberations had been completed, one juror did not recall when he had learned of the previous conviction and the investigator was unable to say when the other jurors had acquired the damaging information. To the question (page 48) " 'Q. And no juror ever told you that they discussed a former trial or former conviction during the deliberations * * *' " the investigator answered: " 'Not in so many words.' "

The defense cited the statement in *People v. Ortiz* (1926), 320 Ill. 205, 213:

> "It is the general rule that where a juror deceives or misleads a party by falsely testifying that he is unprejudiced or impartial, on discovery of the fact after verdict a new trial will be ordered."

Commenting on this language in *Ortiz* our Supreme Court in *Nuccio* said (54 Ill. 2d 39, 48-49):

> "That question was not involved here. Rather, the defendant sought in effect to impeach the verdict of the jury by showing that it was influenced in its deliberations by prejudicial material not in evidence—namely, that the defendant had been convicted in an earlier prosecution. Although a showing that highly prejudicial material not in evidence was considered by a jury during its

deliberations may cause a new trial to be ordered [citation], here it was not alleged or proved that the jurors, before reaching a verdict, discussed the defendant's prior conviction. The general rule is that jurors will not be permitted to impeach their verdict [citation], and there was no reason here for the trial court to call jurors several weeks after the return of their verdict."

While the *Nuccio* case upheld the general rule it obviously did so on the basis that "it was not alleged or proved that the jurors, before reaching a verdict, discussed the defendant's prior conviction." In the case before us the offer of proof indicates that the alleged prejudicial remarks did take place *before* the jury completed its deliberations and reached a verdict. The reasoning of the *Nuccio* case, therefore, does not settle the issue in the case before us.

*Smith v. Illinois Valley Ice Cream Co.* (1959), 20 Ill. App. 2d 312, also cited by the State and considered by the court in its ruling, denying the proffered proof, is not persuasive either, because in that case the affidavit in question was that of a defense attorney and it was countered by an affidavit of the juror in question herself showing that her judgment was not influenced by the matters outside the record alleged in the defense attorney's affidavit. In the case before us the offer of proof showed two jurors were present in court and ready to support the impeaching affidavit by their own direct testimony.

While, therefore, upholding the general rule against jurors impeaching their own verdict, we recognize that in this case the errant juror either had conceived a prejudice against the defendant which he failed to reveal at voir dire or he was supplied information of a prejudicial nature during the trial and prior to the jury deliberations and that the effect was to deprive the defendant of an impartial jury and thus of a fair trial. Under a theory of accountability which rested on a few words of disputed conversation the prejudicial information as to the defendant's prior convictions may well have been an important factor in the jury's determination. If so, the jury's true aim—which was to determine the defendant's guilt or innocence in the single transaction as to which he was accused of being an accessory—was deflected and fell short of even-handed justice.

For the reasons set forth above we believe a new trial should be granted.

Reversed and remanded with instructions to grant a new trial.

T. J. MORAN, P. J., and DIXON, J., concur.