THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HAROLD OLIVER, Defendant-Appellant.

First District (2nd Division)   No. 62979

Opinion filed June 21, 1977.

James Geis and Allen L. Wiederer, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Paul Benjamin Linton, and Linda Dale Woloshin, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE DOWNING delivered the opinion of the court:

In this case, defendant appeals from convictions under two indictments. The first, indictment number 72-796, charged him with armed robbery (Ill. Rev. Stat. 1969, ch. 38, par. 18—2), aggravated battery (Ill. Rev. Stat. 1969, ch. 38, par. 12—4(b)(6)), and resisting a peace officer (Ill. Rev. Stat. 1969, ch. 38, par. 31—1). The second, indictment number 73-2913, charged him with armed robbery, rape (Ill. Rev. Stat. 1971, ch. 38, par. 11—1), and deviate sexual assault (Ill. Rev. Stat. 1971, ch. 38, par. 11—3). Following separate jury trials under each indictment, defendant was sentenced to serve 5 to 15 years in the penitentiary for his conviction under indictment number 72-796, and 20 to 25 years in the penitentiary for his conviction under indictment number 73-2913.

In this appeal, defendant raises four issues for consideration. With respect to his conviction under indictment number 72-796, defendant contends that he was denied his right to a fair trial by an impartial jury because of certain information disclosed by one of the jurors following the verdict. He also contends that he was improperly convicted of both aggravated battery and resisting a peace officer because both charges arose out of a single course of conduct. With respect to his conviction under indictment number 73-2913, defendant contends the trial court

erred in allowing the jury to hear evidence of another crime allegedly committed by him, and that the trial court erred in instructing the jury.

## 72-796—Summary of Evidence

At defendant's trial under indictment number 72-796, the following relevant facts were elicited from the testimony:

Iva Smith testified that at 9 a.m. on July 23, 1971, she was at the Illinois Central Railroad (IC) Windsor Park station located at 76th Street and Exchange Avenue in Chicago, where she was employed as a ticket agent. A man with a gun walked up to her window and said, "Open the door or I will kill you." She opened the door to the booth and two armed men entered. They forced her to crouch under a counter as they filled their pockets and a brown paper bag with money, train tickets, and stickers bearing the IC logotype from the cash drawer. She observed that one of the men, whom she identified as the defendant, wore a pair of yellow slacks with a grey or blue stripe. Asked if that was all of the money, she responded that there was more in the safe. Smith assisted the men in opening the safe. They removed cash from the safe and left the booth. Moments later, defendant reentered the booth and ripped the telephone off the wall. In all, $261.75 was taken.

Smith could hear the men conversing outside for a couple of minutes, although she could not hear what was being said. When she heard them running down the stairs, she looked out the window and observed the men crossing the street below. They were now wearing different clothing. Defendant was now wearing denim levis and a denim jacket.

Later that day, Smith went to the police station where she related to police the details of the crime. She viewed a lineup from which she identified defendant as one of the robbers. At this time, he was wearing the denim clothing she had seen him wearing shortly after the robbery. As she was leaving the room after identifying defendant, the police asked her to stay for a moment. Defendant was then told to remove his denim trousers. He did so, revealing a pair of yellow slacks with a grey or blue stripe underneath. Smith again identified the defendant as one of the robbers.

Silverio Flores, a Chicago police sergeant, testified that he was driving his car to work on July 23, 1971, at approximately 9 a.m. As he proceeded southbound on Exchange Avenue approaching 76th Street, he observed two black males leaving the IC station, walking briskly and looking back over their shoulders. When he came to a stop sign at 76th and Exchange, the men crossed in front of his car, then broke and ran westbound on 76th Street. The shorter of the men was carrying a brown paper bag under his arm.

Flores turned west on 76th Street, and parked his car on a street one

block west of Exchange. He got out of his car and approached the two men. When he pulled out his badge and identified himself as a police officer, the taller man ran into a passageway between two buildings and disappeared. He was not apprehended. The shorter man, whom he identified as the defendant, stopped. Flores approached him, and again identified himself. Suddenly, defendant took a swing at Flores, knocking off his glasses and bruising his right eye. A struggle ensued as Flores attempted to arrest defendant, during which defendant dropped the brown paper bag revealing the proceeds of the IC robbery.

Defendant wrested himself from Flores' grip and ran into a nearby hotel. Flores pursued, stopping to ask the hotel desk clerk to call for assistance. Resuming the chase, Flores enlisted the assistance of one of the hotel's patrons to block defendant's flight down a hallway. Again attempting to effect the arrest, Flores received a bite on the arm and a "stomped toe" at the hands of the defendant. Avoiding capture once more, defendant again fled. He was finally apprehended by other police officers responding to the hotel clerk's call for assistance.

Defendant testified that he had slept at the apartment of a friend at 7650 S. Marquette (a few blocks from the IC station at 76th and Exchange) on the night of July 22, 1971. He awoke between 7:15 and 7:30 a.m. on July 23 to go to work, leaving his friend's apartment at approximately 8:30 a.m. Because he could not start his car, he began to walk toward the home of another friend who lived at 7641 S. Phillips to obtain assistance. As he was walking, a "big Mexican man" (Flores) ran up from behind him, grabbed him, began to choke him and to hit him on the head with the butt of a gun. To protect himself, he ran into the hotel and asked the desk clerk to call the police. Defendant testified that Flores then grabbed him again and only then identified himself as a police officer.

Defendant denied committing the IC robbery, denied having any sort of brown paper bag in his possession, and denied wearing yellow slacks with a blue or grey stripe. He testified that a police officer had forced him to put those slacks on while he was locked in a cell in the police station prior to the lineup.

### 73-2913—Summary of Evidence

At defendant's trial under indictment number 73-2913, the following relevant facts were elicited from the testimony:

Complainant[1] testified that at approximately 8 a.m. on July 3, 1973, she was leaving her residence near 74th Street and South Chappel in Chicago to go to work. As she reached the backyard gate leaving to the alley behind her apartment building, a man with a gun stopped her. The man,

---

[1] The actual name of the complainant is not used in this opinion.

whom she identified as the defendant, said to her: "Don't move, don't scream, or I'll blow your head off." They went back into the yard, and he forced her to go under the back porch with him. He told her to give him her money, and she gave him two dollars and some change.

Then he asked her if she lived in the building. She said yes. He asked her if there was anyone else home and if she had a dog. She answered both questions in the negative. Pointing the gun at her, defendant ordered her to take him to her apartment. Once inside the apartment he made her lock the door and give the keys to him. He conducted a thorough search of the apartment, looking for anyone else who might be there. Satisfied that the apartment was empty and that no one else would come in, he ordered her into the bedroom and told her to undress. He then unzipped his pants and forced her to perform an oral sexual act upon him. During this act, he said, "Is this the best you can do?" He then pushed her down on the bed, put the gun in his back pocket, and had sexual intercourse with her. At one point, she attempted to reach for his gun. He felt her movement and again threatened to kill her. He explained to her that he was doing this because he had a brother who was a drug addict and he needed money to support his brother's habit.

After he reached a climax, he asked her if she had any cash in the apartment. She said no, but suggested that he take her stereo. He replied that he didn't know if he would be able to sell a stereo, but he took some 8-track recording tapes and records and put them into a shopping bag he had brought with him. The complainant observed a clock with a glass dome inside the shopping bag. She asked him where he got it and he replied, "Oh, I'm really hot this morning, I've hit two girls already this morning, and this is what I got from one of them." The defendant then cocked the gun and pointed it at her from a distance of about four feet. She began to cry and begged him not to kill her. He said he wouldn't kill her. Then, he asked her for another shopping bag. She told him she had another one in a closet in front of the apartment. While the defendant reached inside the closet for the bag, the complainant unlocked the door and ran to an apartment building next door. She was still naked. Two men standing in the entrance to the building refused to help her, saying that they didn't want to get involved. She rang all of the doorbells in the building until someone responded, let her in and gave her assistance.

When the police arrived, they accompanied her back to her apartment, but the defendant had gone. She got dressed, and was taken to the hospital. A vaginal smear revealed the presence of sperm in her vagina.

On August 11, 1973, the complainant identified defendant from a lineup as the man who had committed the crimes.

During the State's case in chief, a witness (L.M.[2]) was allowed to testify

---

[2] The initials (L.M.) of the victim are used rather than the full name.

that as she was leaving her parents' home at 72nd and Luella in Chicago approximately one hour before the robbery and rape of the complainant, a man who "looked like" the defendant also robbed and raped her at gunpoint. After pointing the gun at her side, the man said: "Come with me and don't say anything." He led her through an alley to a yard and asked her if she had any money. She gave him approximately two dollars. Then he told her to undress. After she undressed, he raped her. He then told her to dress and asked if she could get any more money. She told him that she lived a short distance away and that she could get more money there. Before they left the yard, the man told her that he had been out doing the same thing since 6 o'clock that morning and that he had a very sick brother for whom he needed money. They then went to L.M.'s home. As they entered the house, her dog, a boxer, began to bark. Visibly frightened by the dog, the man threatened to kill it unless she put him away someplace. She put the dog in the kitchen and closed the door. L.M. then went, alone, upstairs to a room where her mother was sleeping. Her mother awoke. She told her mother that there was someone downstairs and that she needed money. She took some money from the room and went back downstairs. Her mother locked the door behind her and called the police.

When L.M. got back downstairs, the man was holding a glass-domed "400-day" clock that belonged to her parents. He told her to get a bag for the clock. She got him a shopping bag. The man then went toward the front door, opened it, and heard noise upstairs. Again frightened, he made a statement to the effect that he was going to "get out of this alive" and ordered L.M. to come with him. She pushed him out the door and locked it.

The defendant testified that he spent the night of July 2, 1973, in bed with Gloria Smith, his girl friend. He stated that he had slept until 9:20 a.m., after which he had taken his girl friend's mother shopping for food for a Fourth of July celebration to be held the next day.

Gloria Smith supported defendant's alibi. However, she testified that she did not report to police that defendant had been with her and told no one about this until a few days before she was to testify at his trial. A similar account of the events of the morning of July 3, 1973, was provided by Sarah Smith, Gloria Smith's mother.

### I. 72-796

#### A.

Defendant contends he was denied his right to a trial before a fair and impartial jury in the IC armed robbery case. Following the jury's verdict, defense counsel had a conversation with one of the jurors, Sigmund J.

Dziubezynski. Defendant contends that during that conversation, Dziubezynski told defense counsel that he believed the identification testimony of Iva Smith because he knew, based on an experience he had had, that the victim of a crime never forgets the face of the man who did it.[3]

The juror was immediately called to the witness stand for questioning. The substance of his testimony was that five years previously, he had been attacked by two men who had hit him over the head, but who had fled before taking any money from him. As no money had been taken, he did not consider the altercation to have been a crime, did not report the matter to the police, and did not respond in the affirmative when asked, during jury selection, if he had ever been the victim of a crime (although he did characterize the incident during his post-verdict testimony as "my robbery"). Dziubezynski insisted that although he knew, based on this experience, that Iva Smith was correct in her identification of the defendant, his verdict was based on all of the evidence, including the testimony of Silverio Flores, which he also believed.

In *People v. Cole* (1973), 54 Ill. 2d 401, 411-13, 298 N.E.2d 705, 711-13, the Illinois Supreme Court considered in detail the right to a trial by a fair and impartial jury. There, the court stated:

> " * * * The right to a trial by an impartial tribunal is so basic that a violation of the right requires a reversal (*Chapman v. California*, 386 U.S. 18; *Tumey v. Ohio*, 273 U.S. 510, 71 L. Ed. 749, 47 S. Ct. 437.) The right to a jury trial guarantees to one accused of a crime a fair trial by a panel of impartial jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. *Turner v. Louisiana*, 379 U.S. 466, 471-472, 13 L. Ed. 2d 424, 428, 85 S. Ct. 546.* * *
>
> [A] person is not competent to sit as a juror if his state of mind is such that with him as a member of the jury a party will not receive a fair and impartial trial. 'Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.' *United States v. Wood*, 299 U.S. 123, 145-146, 81 L. Ed. 78, 88, 57 S. Ct. 177."

■■ A juror, to be qualified, must come into the trial of a case with a

---

[3] The precise content of this conversation is not clear from the record. Although Dziubezynski was promptly called to the witness stand for questioning, defense counsel was allowed to develop the details of the conversation through the use of leading questions. Thus, only defense counsel, who was not himself testifying, actually related the details of the conversation in the words alleged to have actually been said. Dziubezynski was again called to testify by the State in opposition to defendant's motion for a new trial. At this latter hearing, however, the court would not permit questioning as to the substance of the conversation.

mind uncommitted on the question of guilt or innocence and prepared to weigh the evidence impartially. If the existence of certain facts has been established in his mind touching the guilt or innocence of the accused, to the extent of producing a conviction, he is disqualified, for neither party to the proceeding should be required to adduce proof to remove a preconceived opinion. Such would result in the trial before a juror who had prejudged the case. *People v. Cravens* (1941), 375 Ill. 495, 497, 31 N.E.2d 938; *People v. Ortiz* (1926), 320 Ill. 205, 150 N.E. 708; *Davis v. Walker* (1871), 60 Ill. 452; *People v. Pozzi* (2d Dist. 1976), 42 Ill. App. 3d 537, 543, 356 N.E.2d 186.

■■ It is the general rule that where a juror deceives or misleads a party by falsely testifying that he is unprejudiced or impartial, and that fact is not discovered until after verdict, a new trial will be ordered. *People v. Ortiz*, at 213.

The trial judge, in denying defendant's motion for a new trial, found that juror Dziubezynski had made a misrepresentation during the *voir dire* examination, and stated that had this misrepresentation come to light at any time prior to verdict, he would have dismissed Dziubezynski from the jury. He stated two reasons for denying the motion: first, that Dziubezynski's misrepresentations, serious enough to have warranted excusal prior to verdict, were unintentional; and second, that the case against defendant was not based entirely upon Iva Smith's identification testimony because the testimony of Silverio Flores, which placed defendant near the scene at the proper time, and in possession of the proceeds of the robbery, was sufficient circumstantial evidence in and of itself to support the conviction.

In essence, the trial court was stating that any error which had occurred was harmless. Questions of a defendant's right to a trial by a fair and impartial jury cannot be disposed of by the rule of harmless error. *People v. Cole*, at 411.

■■ We are of the opinion that Dziubezynski's belief that the victim of a crime never forgets the face of the offender could constitute a disqualifying state of mind. It suggests a state of mind that should have been made known to the parties prior to deliberating on the verdict. With such a state of mind, in our opinion, Dziubezynsi could not, as required by *Cravens*, come into the trial with a mind uncommitted on the question of guilt or innocence and prepared to weigh the evidence impartially. The juror entered the jury box with an opinion formed upon one of the main issues in controversy, that is, the credibility of identification testimony (see *Davis v. Walker*) which touched the question of defendant's guilt or innocence. Where a defendant's fundamental rights to due process of law and trial by a fair and impartial jury are at stake, it makes no difference whether a misrepresentation by a juror on *voir dire* which fails to disclose

a preconceived opinion on one of the main issues in controversy is intentional or unintentional. It was, therefore, error for the trial judge to deny defendant's motion for a new trial.

## B.

■■ Defendant next argues that it was error to convict him for two offenses—aggravated battery and resisting a peace officer—because both charges arose out of the same course of conduct, defendant's attempts to avoid apprehension by Sergeant Flores. The State has conceded error. However, because we are reversing defendant's conviction under indictment number 72-796, we need not decide this issue. We note, however, that under the supreme court's recent decision in *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, convictions for both of these offenses under these facts would be proper.

## II. 73-2913

### A.

Defendant contends that he was denied his right to a fair trial under indictment number 73-2913 when the trial court permitted the jury to hear, over his objection, the testimony of L.M.

In the usual case, evidence of other crimes by the accused offered in support of the offense charged, is sufficiently prejudicial to be considered reversible error, especially where the only inference to be drawn from such evidence is that the accused had a propensity to commit the crime charged. (See *People v. Butler* (1st Dist. 1971), 133 Ill. App. 2d 299, 301, 273 N.E.2d 37; *People v. Gleason* (1st Dist. 1962), 36 Ill. App. 2d 15, 16, 183 N.E.2d 523; *People v. Dewey* (1969), 42 Ill. 2d 148, 157, 246 N.E.2d 232.) Such evidence is admissible only where it is so closely connected with the main issues in the case at bar as to tend to prove the accused guilty of the offense charged. (*People v. Tranowski* (1960), 20 Ill. 2d 11, 16, 169 N.E.2d 347, *cert. denied,* 364 U.S. 923, 5 L. Ed. 2d 262, 81 S. Ct. 290, 368 U.S. 978; 7 L. Ed. 2d 440, 82 S. Ct. 484; *People v. Lehman* (1955), 5 Ill. 2d 337, 125 N.E.2d 506.) Evidence of another crime is admissible if it fairly tends to place the defendant in proximity to the time and place of the offense charged, aids or establishes defendant's identity, tends to prove intent, knowledge, motive, a common scheme or design, or a fact material to the issue on trial. Even where it is relevant and material, when the nature of the other crime is such as to highly inflame prejudice against defendant in the minds of the jury, it should be excluded. (See *People v. Butler,* at 302, and citations therein.) The facts of each case must be examined to determine whether the evidence of another crime is sufficiently relevant to prove the accused guilty of the offense charged.

*People v. Spencer* (1st Dist. 1972), 7 Ill. App. 3d 1017,1021, 288 N.E.2d 612.

■■ We are satisfied that the testimony of L.M. was admissible under the above rules to place defendant in proximity to the time and place of the robbery and rape of complainant in indictment number 73-2913, to establish his identity, and to show a common scheme and design.[4] The rape and robbery of L.M. took place approximately one hour prior to the crimes against complainant. (We take judicial notice of the fact that the distance between the scenes of both crimes is approximately four city blocks.) The complainant positively identified defendant, while L.M. said the defendant "looked like" the man who raped and robbed her. In addition, the facts of each crime reveal many similarities: in both, the offender used a gun; in both, he initially demanded money; in both, the victims were forced to submit to sexual acts; in both, the victims were made to take the offender back to their places of residence. The man who raped and robbed L.M. was visibly frightened by the dog when he entered her household and when he became aware of the presence of others in the house; the man who raped and robbed the complainant inquired, before entering her apartment, whether there was anyone else there or if anyone was likely to come in. He conducted a thorough search of the apartment to make sure no one else was there. He inquired as to whether she had a dog. During the commission of both crimes, the offender spoke of a sick brother for whom he needed money. The clock taken from L.M.'s residence was left in the complainant's apartment.

■■ This evidence fairly tends to establish that both crimes were committed by the same man. Whether that man was the defendant was a question of fact for the jury, based on their assessment of the credibility of the identification testimony. This evidence is not of such a nature as to highly inflame prejudice against the defendant in the minds of the jury. Accord, *People v. Walker* (1966), 34 Ill. 2d 23, 213 N.E.2d 552; *People v. Lehman; People v. Tranowski; People v. Norfleet* (1st Dist. 1972), 4 Ill. App. 3d 758, 281 N.E.2d 761.

### B.

■■ Defendant finally contends that the trial court erred in giving the jury, over his objection, IPI Criminal No. 3.07, the confession instruction.

---

[4] We note our supreme court's recent decision in *People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288, that evidence of other crimes to bolster the credibility of a State's witness is not admissible where such other crimes occur subsequent to the offense charged, and did not facilitate the offense charged, but that such evidence is admissible to explain the otherwise implausible circumstances surrounding the commission of the offense charged such as it considered in *People v. Cole* (1963), 29 Ill. 2d 501, 194 N.E.2d 269. We believe that *Romero* is distinguishable from the case at bar, in that the evidence of other crimes occurring prior to the offense charged is admissible to place the defendant in proximity to the time and place of the offense charged, to establish his identity, and to show a common scheme and design.

That instruction read:

"You have before you evidence that the defendant confessed that he committed the crime charged in the indictment. It is for you to determine whether the defendant confessed, and, if so, what weight should be given to the confession. In determining the weight to be given to a confession, you should consider all of the circumstances under which it was made."

The evidentiary basis for this instruction lies in certain oral statements made by defendant to the police and to an assistant state's attorney following his arrest. The statements which allegedly comprise defendant's confession are: "Can you get me some help? I am sick mentally"; "I want to talk to you about what I am accused of"; and, "I am sorry for what I have done. I need help. When I had sex, I was under the influence of narcotics." Defendant was also reported to have made statements to the effect that he had recognized the girl who viewed him at the August 11, 1973, lineup as, "the girl I met on the street and had sex with," that he had raped some white girls in the area of 70th and South Shore, and that he had sometimes used a pellet gun to commit these crimes. At the trial, defendant denied having made any of these statements.

A confession is a voluntary admission or declaration by a person of his agency or participation in a crime. It is an acknowledgement of guilt and not of mere incriminating facts. An acknowledgement of facts merely tending to establish guilt is not a confession but only an incriminating admission. (*People v. Sovetsky* (1926), 323 Ill. 133, 137, 153 N.E. 615.) In *People v. Georgev* (1967), 38 Ill. 2d 165, 175, 230 N.E.2d 851, the court quoted this language from *People v. Stanton* (1959), 16 Ill. 2d 459, 158 N.E.2d 47:

"There is a distinction between a statement which is only an admission and one which constitutes a confession of guilt of the crime charged. A confession is a voluntary acknowledgement of guilt after the perpetration of an offense, and it does not embrace mere statements or declarations of independent facts from which guilt may be inferred, while an admission is any statement or conduct from which guilt of the crime may be inferred but from which guilt does not necessarily follow. [Citations.]"

See *People v. Stapleton* (1921), 300 Ill. 471, 476, 133 N.E. 224.

■■ The statements attributed to the defendant cannot be fairly characterized as a confession. They are merely fragments of a conversation removed from the context in which they were made. They are lacking in sufficient detail to link them to the rape and robbery of the complainant. We note that the record reflects that at the time of defendant's trial under indictment number 73-2913, he was also under

indictment for a number of other rapes committed in the general area of 70th Street and South Shore. The statements by which defendant allegedly confessed to the crimes against the complainant may apply equally as well to any of those other offenses.

■■ While we have found error in giving the confession instruction, we conclude that a reversal is not warranted because the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) "Even though error may have been committed in giving or refusing instructions it will not always justify reversal when the evidence of defendant's guilt is so clear and convincing that the jury could not reasonably have found him not guilty." *People v. Ward* (1965), 32 Ill. 2d 253, 256, 204 N.E.2d 741, *cert. denied*, 384 U.S. 1022; *People v. Haygood* (1st Dist. 1965), 60 Ill. App. 2d 70, 208 N.E.2d 373; *People v. Thompson* (1950), 406 Ill. 323, 94 N.E.2d 163.

The record in this case demonstrates that the prosecution did not rest heavily on a confession theory. Other evidence of defendant's guilt was overwhelming. The complainant had more than an adequate opportunity to view defendant during the commission of the crimes. The quality of her testimony demonstrates that during the robbery and rape, she possessed a certain presence of mind which enabled her to provide the police with a very detailed description of the offender. She was unequivocal in her identification of him both at the August 11, 1973, lineup and at the trial. The testimony of L.M. served to place the defendant near the scene at the time of the crimes. The clock taken from L.M.'s home was seen by the complainant while still in the company of the defendant, and was left in the complainant's apartment. The many similar features of the rape of both victims clearly show a common scheme to both crimes.

Finally, the testimony of Gloria and Sarah Smith, purporting to corroborate defendant's alibi, contained so many inconsistencies and improbabilities as to be without any serious credibility. For example, defendant maintained that he recalled the events of the morning of July 3 because he had taken Sarah Smith shopping for food for a Fourth of July celebration which was to have taken place the next day. Sarah Smith testified that the picnic was not held in the backyard of their residence at 7122 East End Avenue because the yard, which was full of garbage, was not suitable for a picnic. Yet defendant testified, in response to a leading question on cross-examination, that the Fourth of July celebration had taken place in the Smith backyard. In addition to such glaring inconsistencies, Gloria Smith's version of the events leading up to her testimony was very confused. At one point, she insisted that she had first supplied defendant's alibi to his attorney near the end of July 1973, which was before defendant's arrest. She could not explain why she had not

come forward with the alibi following defendant's arrest, or why she had waited until a few days before her testimony to come forward. It would not be reasonable for a jury to conclude, based on this evidence, that she would not have come forward with the alibi between the time of defendant's arrest in August of 1973 and his trial in late January of 1974.

Faced with such evidence, a jury could not have reasonably found defendant not guilty, even if it had been properly instructed.

### Conclusion

For the reasons herein set forth, the judgment of the circuit court of Cook County in indictment number 72-796 is reversed and the cause is remanded for a new trial; the judgment in indictment number 73-2913 is affirmed.

STAMOS and PERLIN, JJ., concur.